**Electronically Filed
Supreme Court
SCEC-18-0000910
25-JAN-2019
03:54 PM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

SCEC-18-0000909

THOMAS WATERS a/k/a TOMMY WATERS, Plaintiff,

vs.

SCOTT NAGO, Chief Election Officer; STATE OF HAWAI'I OFFICE OF
ELECTIONS; and GLEN TAKAHASHI, in his official capacity as the
City Clerk of the City and County of Honolulu, Defendants.

----------------------------------------------------------

SCEC-18-0000910

NATALIE IWASA; DAVID ABBOTT; NOA BATLIN; MICAH BATLIN; DENISE
BOISVERT; JOHN CHOI; RUTH P. CHUN; ANGELA CORREA-PEI; RAFAEL del
CASTILLO; LEA del CASTILLO; NINA DASWANI; RENE M. GARVIN; JASON
GODWISE; KENNETH HAMILTON; RICHARD HIRAMOTO; LAURA HIRAMOTO;
DWIGHT H. IWASA; ORIAN IWASA; DANIEL JACOB; CYNTHIA JARRELL;
JEANNINE JOHNSON; KIM JORGENSEN; MARSHA JOYNER; JAMES E. KIRK;
DONALD KOELPER; RICHARD LACEY; TORI MARCHIEL; JAMES MARTINDALE;
RICKY MARUMOTO; ARNOLD MATSUURA; BONNIE DAVIS OZAKI; NALANI
PARRY; RICHARD PARRY; BEN ROOSEVELT; MAXINE RUTKOWSKI; SHIRLEY
MARGARET ROPER; RICK ROPER; CINDY ROTE; EVANGELINE YACUK,
Petitioners,

vs.

SCOTT NAGO, Chief Election Officer; STATE OF HAWAI'I OFFICE OF
ELECTIONS; and GLEN TAKAHASHI, in his official capacity as the
City Clerk of the City and County of Honolulu, Respondents.

ORIGINAL PROCEEDING

JANUARY 25, 2019

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

PER CURIAM

        Two election contests were brought as original actions with this court challenging the result of the City and County of Honolulu second special election for councilmember for District IV held on November 6, 2018.  The critical issue in these cases concerns the collection of 350 absentee mail-in return envelopes by the City Clerk at the Honolulu Airport post office on election day of November 6, 2018.  Under our election law, these envelopes were required to be "received" by the City Clerk no later than the close of the polls on election day, which was set by statute at 6:00 p.m.  However, it is undisputed that the City Clerk did not take possession of these absentee mail-in return envelopes until after that deadline, retrieving them from the mail facility in pickups that occurred at approximately 6:30 p.m. and 7:30 p.m.  The ballots that were included in these envelopes were subsequently commingled with other ballots and then counted in determining the outcome of the election.

        We conclude that the 350 absentee mail-in return envelopes were "received" by the City Clerk after the deadline established by state law, and accordingly, the ballots they contained should not have been counted.  These 350 ballots

exceed the 22-vote margin by which the election was decided and, because they have become commingled with other ballots that were validly cast, it is now impossible to exclude the late-received ballots and determine the correct election result. Therefore, the only alternative is to invalidate the result of the Honolulu City Council District IV special election.

Thus, having heard this matter with oral argument and in accordance with HRS § 11-174.5(b) (2009) (requiring the supreme court to "give judgment, stating all findings of fact and of law"), we consolidate these original actions for disposition, set forth the following findings of fact and conclusions of law, and enter judgment.

### FINDINGS OF FACT

### Absentee Ballots in City and County of Honolulu Special Elections

1. Pursuant to the Revised Charter of the City and County of Honolulu, nonpartisan special elections for elective officers are held in conjunction with the State of Hawai'i's (the "State") primary and general elections except as otherwise provided. Revised Charter of the City and County of Honolulu § 13-116 (2017).

2. In these joint elections, the City and County of Honolulu (the "City") administers the absentee walk-in locations, the mailing and receipt of absentee mail ballots, and

the resolution of provisional ballots. The State of Hawai'i Office of Elections ("Office of Elections") supervises the overall administration of the election, including managing the polling places, selecting the precinct officials, and counting the validly cast ballots.

3. Twenty days prior to an election, the City Clerk mails an absentee ballot to each registered voter who has requested one, together with a yellow envelope to seal the completed ballot (the "secret ballot envelope") and a larger blue business reply mail envelope in which to return the secret ballot envelope (the "absentee return envelope"). A voter affirmation statement and a line for the voter's signature are printed on the outside of the absentee return envelope.

4. A voter may cast an absentee ballot at any time prior to the close of polls on election day by mailing a sealed absentee return envelope to the City Clerk via the United States Postal Service (the "USPS") or by hand delivering a sealed absentee return envelope to any polling place. Polling places include absentee walk-in locations managed by the City Clerk that are open prior to election day and in-person election day polling places administered by the Office of Elections.

5. Absentee return envelopes that are returned to in-person polling places on election day are collected by Office of Elections polling officials, who transfer the sealed absentee

4

return envelopes to the City Clerk following the closing of the polls.

6. The City Clerk "validates" the voter's signature appearing on each absentee return envelope, which under Hawaii Administrative Rules (HAR) § 3-174-11 is performed by comparing it to the signature on the voter's absentee ballot request or voter registration. The City Clerk does not open any absentee return envelopes.

7. The City Clerk marks those absentee return envelopes that are not validated "invalid" and retains custody of them, to be disposed of in a manner prescribed by statute.

8. The City Clerk transfers the validated absentee return envelopes to the Office of Elections for tabulation.

### The November 6, 2018 Second Special Election for the District IV City Council Seat

9. On November 6, 2018, in conjunction with the State's general election, the City held a nonpartisan second special election for the seat of the District IV city councilmember.

10. Thomas Waters (also known as Tommy Waters) and Trevor Ozawa were the nonpartisan candidates for the District IV councilmember seat.

11. Twenty days prior to the November 6, 2018 second special election, City Clerk Glen I. Takahashi ("City Clerk

Takahashi" or "City Clerk") mailed out absentee ballots, together with secret ballot envelopes and absentee return envelopes, to 172,526 registered voters who had requested absentee ballots.

12. For the 2018 general election, the City Clerk deemed a total of 132,016 absentee return envelopes to be validly returned during the entirety of the absentee voting period, which ran from October 17, 2018, to the close of polls on election day.[1]  The record does not indicate the total number of absentee return envelopes received from registered voters in District IV during the entirety of the absentee voting period.

13. Following the close of polls on election day, the Office of Elections issued a total of four printouts detailing the ongoing tabulation of votes in various races.

a. The first printout was issued at 6:09 p.m. and reported the result of the race for the office of councilmember for District IV as follows:

```
OZAWA, Trevor        10,597 (46.4%)
WATERS, Tommy         10,529 (46.1%)
     Blank Votes:      1,686 ( 7.4%)
     Over Votes:          10 ( 0.0%)
```

---

[1]     There are approximately 734 absentee return envelopes that the City Clerk retrieved after November 6, 2018, of which the City Clerk retains possession.

b. The second printout was issued at 8:08 p.m. and reported the result of the race for the office of councilmember for District IV as follows:

```
WATERS, Tommy          11,616 (46.0%)
OZAWA, Trevor          11,609 (46.0%)
     Blank Votes:       2,009 ( 8.0%)
     Over Votes:           10 ( 0.0%)
```

c. The third printout was issued at 9:36 p.m. and reported the result of the race for the office of councilmember for District IV as follows:

```
WATERS, Tommy          17,795 (46.4%)
OZAWA, Trevor          17,723 (46.2%)
     Blank Votes:       2,796 ( 7.3%)
     Over Votes:           10 ( 0.0%)
```

d. The fourth printout was issued at 11:23 p.m. and reported the result of the race for the office of councilmember for District IV as follows:

```
WATERS, Tommy          17,795 (46.4%)
OZAWA, Trevor          17,723 (46.2%)
     Blank Votes:       2,796 ( 7.3%)
     Over Votes:           10 ( 0.0%)
```

14. The following day, on November 7, 2018, at 4:11 a.m., the Office of Elections generated a fifth printout for the election. The result of the race for the office of councilmember for District IV was reported as follows:

```
OZAWA, Trevor          18,357 (46.3%)
WATERS, Tommy          18,335 (46.3%)
     Blank Votes:       2,908 ( 7.3%)
     Over Votes:           10 ( 0.0%)
```

15. Although the fifth printout was entitled "Final Summary Report," a "post-election process" occurred over the

7

next week that resulted in an additional three votes being added to the totals from the fifth printout: one vote each for Ozawa and Waters and one blank vote. A second "Final Summary Report" was generated on November 15, 2018 and posted on the Office of Elections' website. The final result of the race for the office of councilmember for District IV was reported as follows:

| OZAWA, Trevor | 18,358 (46.3%) |
|---|---|
| WATERS, Tommy | 18,336 (46.3%) |
| Blank Votes: | 2,909 ( 7.3%) |
| Over Votes: | 10 ( 0.0%) |

16. According to this Final Summary Report, the difference in the number of votes between Waters and Ozawa was 22 votes. The report thus indicated that Ozawa had received the highest number of votes.

## Post-Election Communications

17. On November 16, 2018, Waters sent an e-mail to Chief Election Officer Scott T. Nago ("Chief Election Officer Nago") and City Clerk Takahashi requesting a range of information regarding, inter alia, the handling of absentee ballots and the manner in which ballots were tabulated in the November 6, 2018 election. Among the specific items of information Waters requested were an explanation of where and how the new ballots counted in the fifth printout were cast; the details of when and how mail-in absentee return envelopes were received, including the times at which mail-in absentee return envelopes were picked up or delivered on election day; an

accounting of the absentee ballots that were invalidated within District IV; the details of the process employed in validating signatures on absentee return envelopes; a list of the devices used to cast and tabulate votes, along with the margin of error associated with each; a list of "overages and underages" and the details of how such discrepancies are addressed in a manner that does not impact the final election result; and an explanation of how voter intent is determined in a close election without resorting to hand counting the ballots. Waters also offered to sit down with Chief Election Officer Nago or City Clerk Takahashi to discuss his questions.

18. On November 21, 2018, Waters received a response from Jaime Kataoka of the Office of Elections providing the final summary report of the November 6, 2018 election, the "Records of Ballots Cast," the "AB-3: Walk and Mail Voted Ballot Summary" for the absentee mail and walk-in polling places, and a matrix of the overages and underages for the district/precincts associated with the District IV race.

19. On November 23, 2018, Waters received a letter from Rex Quidilla, Elections Administrator for the Office of the City Clerk, Elections Division, City and County of Honolulu, State of Hawaiʻi, indicating that the City Clerk invalidated 616 mail absentee return envelopes for the 2018 general election and providing a breakdown of the reasons for the invalidation.

20. The answers from Kataoka and Quidilla are the only information that Waters received in response to his inquiry.[2]

21. A November 19, 2018 article published in the Honolulu Star-Advertiser that was included as an exhibit in a filing by Waters included relevant information that was not included in Kataoka's or Quidilla's answer to Waters's inquiry. Specifically, the article described the transfer from Office of Elections personnel to the City Clerk of absentee return envelopes that were dropped off at in-person polling places, the verification process, and the subsequent transfer of ballots back to the Office of Elections for tallying. The article cites Quidilla as the source of the information.

**The Election Contest filed by Waters (SCEC-18-0000909)**

22. On November 26, 2018, Waters filed a complaint contesting the election results for the District IV councilmember race.

23. Waters asserts two counts for relief:

---

[2]    In a complaint filed by thirty-nine registered voters residing in District IV, discussed infra, the voters allege that they also made inquiries with the Office of Elections regarding the handling of the ballots that were included in the fifth printout and were directed to the Office of the Attorney General. The voters indicate that the deputy attorney general to whom the calls were referred initially stated that she had no information about the ballots included in the fifth printout, the procedures used, or any established rules governing the chain of custody of absentee return envelopes. The voters allege that one week later, the deputy attorney general confirmed that the Office of the Attorney General had no knowledge of any written procedures or rules regarding the chain of custody, nor of how the ballots were actually transported on the night of the election.

a. Count I -- Waters alleges that the 1,286[3] absentee ballots in the District IV election that were counted between the fourth printout and the fifth printout were miscounted because they were transported to and received by the clerk in the State Capitol on November 6, 2018, nearly six hours after polls had already closed, in violation of HRS § 15-9 (2009). The improper inclusion and counting of the 1,286 invalid absentee ballots after 100 percent of the district/precincts in District IV reported their ballot tabulations "directly changed the proper result of the election."

b. Count II -- Waters alleges that 39,603 ballots in the District IV election were miscounted because the difference of 22 votes is 0.00055 of 1%, which falls within the margin of error for the vote-counting machines used in Hawaiʻi for the 2018 general election, and that the failure to verify the accuracy of the count, including the 2,908 "blank" votes and

---

[3] In Waters's complaint, Waters identifies the number of absentee ballots that were allegedly received after the close of polls as 1,286 absentee votes, consisting of 1,173 counted ballots and 113 blank ballots. (At various points in the complaint, Waters also makes reference to 1,174 counted ballots.) These numbers roughly correspond with the difference between the number of votes reported by the Office of Elections in the fourth and fifth printout or the November 15, 2018 "Final Summary Report." Quidilla initially stated in a filing to this court that there were 1,286 absentee return envelopes for District IV received by the City Clerk on election day. In a January 14, 2019 declaration, Quidilla clarified that the actual number of absentee return envelopes received on election day was 1,201.

the 10 ballots which indicated votes for both candidates, and the invalidated and spoiled ballots, "constituted an error, mistake or irregularity which would change the outcome of the election."

24. Waters asks the court to (1) invalidate the inclusion of 1,174 invalid absentee ballots counted in the fifth printout and declare him the prevailing candidate and winner of the election for Honolulu City Councilmember for District IV; (2) order a hand count and human inspection of the 39,603 ballots cast in District IV and other invalidated ballots; or (3) invalidate the result of the general election for councilmember for District IV and require that a new election be held.

**The Election Contest Filed by 39 Voters Who Reside and are Registered to Vote in District IV (SCEC-18-0000910)**

25. On November 26, 2018, 39 voters who reside and are registered to vote in Council District IV filed a complaint contesting the election results for the District IV councilmember race.

26. The 39 voters assert three counts for relief: (1) the "Last Printout Procedure Gives Rise to a Mistake" (Count I); (2) the "Margin of Error Constitutes a Mistake" (Count (II); and (3) "Discrepancies Constitute Fraud and/or Mistake" (Count III).

27. The 39 voters allege that Chief Election Officer Nago, the Office of Elections, and City Clerk Takahashi "miscounted, misapplied, and mishandled more than 22 valid ballots cast in the District IV election" and that if the ballots had been properly counted and handled as prescribed by law, Waters would have been deemed to have received the majority of validly cast votes. They further allege that the difference of 22 votes out of more than 39,000 votes is within the margin of error for the utilized voting machines that was previously identified in a 1999 State of Hawaiʻi Legislative Auditor's Report of an election oversight committee.

28. The 39 voters ask the court to (1) exclude the fifth printout and declare that Waters received the majority of valid votes cast in the District IV election; (2) invalidate the results of the District IV election due to an inability to determine the winner; or (3) require a hand recount in order to ensure an accurate count of all votes cast.

### City Clerk Takahashi's Answer to the Complaints

29. On December 6, 2018, City Clerk Takahashi filed answers to the two complaints.

30. City Clerk Takahashi denies any improper conduct or that any irregularities transpired during the second special election. City Clerk Takahashi contends that all of the absentee return envelopes that were received on election day,

either by USPS mail or drop-off delivery at a polling place, were received and handled in compliance with HRS § 15-9(a), and thus were correctly included in the vote count of the ballots for Council District IV.

31. With respect to the allegations in the complaints related to the alleged margin of error and discrepancies involved in the counting of votes, City Clerk Takahashi explains that he is not involved in any way in the tabulation of ballots or printouts and has no knowledge as to the truth or falsity of the allegations.

32. Attached to City Clerk Takahashi's answers are declarations by Quidilla and himself setting forth additional details regarding the handling, collection, and receipt of absentee return envelopes on election day.

33. Consistent with past practice, representatives of the City Clerk met with representatives of the USPS's O'ahu operations ("USPS O'ahu") on September 28, 2018 in preparation for the 2018 general election.

34. During the meeting, the representatives of the City Clerk and USPS O'ahu discussed the USPS's collection and handling of the mail absentee return envelopes in the USPS mailing system on election day.  The following procedures were agreed to:

a. USPS personnel would conduct a "sweep" of its Honolulu Airport mail processing plant at 6:00 p.m. on election day to collect all mail-in absentee return envelopes within the facility.

b. In addition to the regularly scheduled 9:00 a.m. mail pickup, the City Clerk would conduct two additional pickups to retrieve the mail-in absentee return envelopes collected during the 6:00 p.m. "sweep" of the mail processing plant. The first additional pickup time was scheduled for 6:30 p.m. A second additional pickup time was scheduled to occur at 7:30 p.m. if there were any mail-in absentee return envelopes collected during the 6:00 p.m. "sweep" of the mail processing plant that were not included in the 6:30 p.m. pickup.

35. Neither City Clerk Takahashi's nor Quidilla's declaration provided actual details of what occurred at the USPS Honolulu Airport mail processing plant on the day of the election, and there is no evidence in the record regarding the procedures actually employed by the USPS on election day.

36. Following the close of polls on the day of the November 6, 2018 general election, Office of Elections personnel completed the transfer of the absentee return envelopes that were dropped off by hand at in-person polling places to the City Clerk at approximately 9:00 p.m.

37. Upon receiving the absentee return envelopes from the Office of Elections, the City Clerk's staff transported the envelopes to the City Clerk's Elections Division facility located near the Daniel K. Inouye International Airport for signature validation.

38. The City Clerk received a total of 8,120 absentee return envelopes on the day of the election, 1,201 of which were from registered voters in Council District IV.

39. The City Clerk validated 8,088 of the absentee return envelopes received on election day, of which 1,189 were from registered voters in Council District IV.

40. The City Clerk invalidated a total of 620 absentee return envelopes received throughout the absentee voting period, of which 91 were for Council District IV. The ballots were invalidated for the following reasons:

a. 433 absentee return envelopes, of which 64 were from voters registered in Council District IV, were invalidated because the signature on the voter's affirmation statement was deemed not to correspond with the voter's signature on the absentee ballot request or voter registration affidavit.

b. 140 absentee return envelopes, of which 17 were from voters registered in Council District IV, were

invalidated because no signature appeared on the voter affirmation statement.

c. 43 absentee return envelopes, of which 9 were from voters registered in Council District IV, were invalidated because the voter was found to have already voted or voted at the wrong precinct, to have cancelled the ballot, to be deceased, or to have relocated to the Mainland.

d. 4 absentee return envelopes, of which 1 was from a voter registered in Council District IV, were invalidated because the voter had cast an electronic ballot without providing the required privacy waiver or affirmation documents.

41. After the signatures on the absentee return envelopes were validated, the City Clerk contacted the Office of Elections to arrange for the pickup of the envelopes. The Office of Elections picked up the sealed absentee return envelopes at approximately 12:30 a.m. on November 7, 2018, and transported the envelopes to the State Capitol for opening and ballot tabulation.

## The Motions to Dismiss or, in the Alternative, Motions for Summary Judgment

42. On December 6, 2018, Chief Election Officer Nago and the Office of Elections (collectively, the "State Defendants") filed motions in both cases to dismiss the election complaints or, in the alternative, for summary judgment. They

17

ask the court to declare that Ozawa was elected as councilmember for District IV.

43. In the motions, the State Defendants contend that the complaints lack any allegations that demonstrate errors, mistakes, or irregularities that would change the outcome of the election.

44. The State Defendants contend that both the absentee return envelopes that were dropped off at polling places and the mail-in absentee return envelopes were received by the close of the polls, verified, and securely transported to the counting center at the State Capitol to be opened and counted with the remaining ballots. This handling is in compliance with all applicable election laws, the State Defendants argue.

45. The State Defendants assert that, although the difference in the votes cast for Ozawa and Waters is small, there is no statutory provision for an automatic recount of the ballots. They argue that the election challengers did not provide specific information regarding any margin of error for the voting machines, and they thus failed to provide actual information of mistakes or errors sufficient to change the result of the election as required by law.

46. Lastly, the State Defendants contend that any suggestion that a "large shift towards Ozawa" in the fifth

printout indicates fraud or mistake is purely speculative and thus legally insufficient.

47. Attached to the motions to dismiss or, in the alternative, motions for summary judgment, are declarations from Chief Election Officer Nago and Rich Geppert, one of the professional services managers for Hart InterCivic, Inc. ("Hart"), the vendor of the electronic voting machines used in the 2018 elections. The declarations provide details regarding the handling, tabulation, and reporting of votes in the 2018 general election.

48. The voting system that was used during the 2018 general election was inspected and tested by official observers in preparation for use in the general election, and official observers were present at the State Capitol to observe the counting of ballots.

49. There are four scheduled times on election night at which the Office of Elections releases reports of the election tallies as they then stand: (1) upon the close of polls, (2) at 8:30 p.m., (3) at 10:00 p.m., and (4) at 11:30 p.m. The Office of Elections then releases a final election night report once all ballots have been counted. It is not uncommon for the final report of the night to come in the early morning hours following the day of the election.

50. In the November 6, 2018 race for councilmember for District IV, the 4:11 a.m. fifth printout that was released on November 7, 2018, included the absentee ballots provided to the counting center by the City Clerk as well as so-called "defective ballots" that had been duplicated for counting.[4]

51. On the night of the general election, a manual audit team audited the computer-generated tally of ballots voted at the polls as well as mail-in absentee ballots to confirm the accuracy of the vote counting system.

52. The audit team did not request an expanded audit.

53. Should a recount be required, the Office of Elections states that it is required to follow the same set of rules in counting the ballots as was used on election day.

54. In sum, Chief Election Officer Nago was not aware of any issues or problems with the accuracy of the voting and vote counting system, the handling of ballots, or any other matters that would impact the integrity of the general election results in Council District IV.

55. On December 14, 2018, City Clerk Takahashi filed joinders to the motions to dismiss or, in the alternative,

---

[4] A "defective ballot" is "any ballot delivered to the counting center that cannot be processed and read by a central counter or precinct counter." When this occurs, a "duplicate ballot" is created, which is "a ballot used solely for the purpose of creating a facsimile of a defective ballot that is reproduced for counting and tabulation." HAR § 3-172-1.

motions for summary judgment with respect to claims and issues related to the collection, receipt, and handling of the mail-in absentee return envelopes and the functions of the City Clerk in the election process.

### Ozawa's Answers to the Complaints

56. On December 17, 2018, Ozawa, who had been granted permission to intervene in these election contests, filed answers to the respective election complaints.

57. Ozawa argues that City Clerk Takahashi and the Office of Elections have averred and explained that all ballots that were counted as part of the fifth printout were received before the closing of the polls. Ozawa further argues that there is no evidence of provable fraud and that simply alleging that the purported margin of error exceeds the margin by which the vote was decided is legally insufficient because there is no evidence that any miscalculated votes were cast for Waters. Ozawa thus maintains that neither Waters nor the 39 voters have met their burden to prevail in their respective election challenges.

58. On December 17, 2018, Ozawa also filed substantive joinders to the State Defendants' motions to dismiss or, in the alternative, motions for summary judgment.

**The December 28, 2018 Order**

59. On December 28, 2018, this court issued an order directing Chief Election Officer Nago, the Office of Elections, and City Clerk Takahashi to provide information setting forth the margin of error for the electronic vote counting machines that were used in the November 6, 2018 election and information setting forth how the intent of the voter is ensured in a close election without a hand recount, which was previously requested by Waters shortly after the election and before he filed his complaint.

60. On December 31, 2018, the State Defendants filed a response to the court's December 28, 2018 order.[5]  Included with the response are declarations from Chief Election Officer Nago and from David Magedson, a program manager for Hart.  The declarations set forth information regarding the electronic voting systems used in the November 6, 2018 election.

---

[5]    On December 31, 2018, City Clerk Takahashi filed his response to the court's December 28, 2018 order.  City Clerk Takahashi explains that he is not involved in the tabulation of ballots or review of "marginal marks" on ballots and, therefore, he does not have any information to provide the court and the parties in response to the court's request for information.  City Clerk Takahashi notes that he relies on Chief Election Officer Nago and the Office of Election's response to the court's request for information.  The same day, Ozawa also filed a response to the court's December 28, 2018 order in which he reiterates his contention that the election challengers' complaints fail to meet their burden of demonstrating fraud or mistake that would alter the result of the election or make it impossible to determine an accurate result.

61. Since 2008, Hawaiʻi has utilized the Hart voting system, which is composed of three main components: (1) eSlate, an electronic voting unit on which a voter may directly cast a vote; (2) eScan, a digital ballot imaging precinct counter that allows a voter to cast a vote by inserting a paper ballot into the machine; and (3) Ballot Now, which is software that utilizes high-speed scanners to scan and tally absentee ballots.

62. The Hart voting system is certified to federal standards, which relate to the initial testing of the machines. See Federal Election Commission, I Voting System Standards: Performance Standards § 3.2.1 - Accuracy Requirements (2002). The error rate in the federal standards refers to a misreading of ballot positions that is not attributable to an error on the part of the voter, and it thus addresses only situations in which a ballot has been properly marked.

63. The Ballot Now system records a digital image of a voted ballot with a resolution of approximately 200 dots per inch, which is saved on the Ballot Now system and used for all subsequent election activities. The software counts the number of marked pixels inside each option box in the digital image to determine whether a vote has been cast for that option. If more than 4.2% of the pixels are marked, the option box will generally be recorded as having been marked.

64. Thus, when a voter makes a "marginal mark" or a mark that does not fully comply with ballot instructions, the vote will generally be counted if 4.2% or more of the pixels within the option box are marked.

65. When an option box is marked so that the number of pixels marked falls within approximately seven pixels of 4.2%, it is possible for an option box to be read as marked in one scan but read as unmarked in a second scan (or vice-versa). Studies of past election data have shown that around 0.046% of option boxes fall into the pixel range where this variance can occur.[6]

66. On January 4, 2019, Waters filed a reply to the State Defendants' response to the December 28, 2018 order.

67. Waters argues that Chief Election Officer Nago and the Office of Elections' responses are misleading and reveal that the Hart system does not ensure the intent of the voter is honored in a close election without a hand count because it disregards ballots that are not "properly marked" regardless of

---

[6]     Ballot Now can also apply an algorithm (the Ballot Now Overvote Reduction Algorithm, or "BNORA") to decrease this variance rate by eliminating false overvotes caused by pen rests, dirt, or other small marks on the ballot.  The precinct counters used in polling places and at absentee walk-in locations do not use BNORA.  Instead, as the voter is present in those locations, the precinct counters are equipped to return the ballot to the voter if the precinct counter detects an overvote (i.e., more voting positions have been marked in a contest than permitted) or a blank vote for a contest (i.e., no voting position in the contest has been marked).

the evidence of voter intent.  Waters states that the manner in which marginal marks are counted is problematic because the system's cutoff of 4.2% of pixels marked is an arbitrary standard.

68. In his reply, Waters also argues that absentee ballots that were not received by the City Clerk or the Office of Elections by the close of the polls at 6:00 p.m. were wrongly counted in the election results.  Waters contends that, pursuant to HRS § 15-9(a), absentee ballots must be received by the City Clerk by the close of the polls, which is 6:00 p.m.  He maintains that, contrary to statute, the ballots were received by the City Clerk during the 6:30 p.m. and 7:30 p.m. pickups at the airport.  Waters contends that these ballots must be invalidated, thereby altering the result of the election and making him the victor.

### The 39 Voters' Opposition to the Motion to Dismiss or, in the Alternative, Motion for Summary Judgment

69. On January 4, 2019, the 39 voters filed a memorandum in opposition to the motion to dismiss or, in the alternative, motion for summary judgment.

70. The 39 voters argue that they have carried their burden of demonstrating fraud or mistake that could alter the election result.  They contend that HRS § 15-9 obligated the City Clerk to invalidate the absentee return envelopes that were

collected from the USPS after the closing of the polls. The 39 voters argue that the invalidation of these ballots would ultimately change the outcome of the election in Council District IV.

71. The 39 voters also argue that the State Defendants' response to this court's December 28, 2018 order raises questions about the actual margin of error because blind acceptance of the manufacturer's stated error rate ignores documented instances in other states in which the Hart system has produced more inaccurate results. The State Defendants have a duty to protect voter rights and ensure accurate results, the 39 voters contend, and this includes investigating the accuracy of the manufacturer's assurances.

72. The 39 voters further contend that the State Defendants' response to this court's December 28, 2018 order demonstrates that the State applies an inconsistent standard in determining voter intent. In the absence of any explanation of how the cutoff of 4.2% of pixels was determined, the voters argue, the number must be regarded as an arbitrary figure. The voters assert that this standard, in conjunction with the variance that occurs when a marginal marking falls within seven pixels of the threshold, demonstrates that no meaningful distinction exists between those marginal votes that are counted and those that are not.

## The January 8, 2019 Order

73. On January 8, 2019, this court issued an order directing the State Defendants and City Clerk Takahashi to provide a detailed explanation of the factual circumstances and procedures that were actually followed by the USPS and the City Clerk regarding the handling and collection of the mail-in absentee return envelopes retrieved from the USPS on election day. The order requested, among other information, the time(s) of the collection and pickup of the absentee ballots; a description of the procedures that were actually used to ensure that any mail-in absentee return envelopes received, collected, or "swept" by the USPS after 6:00 p.m. on election day were set aside and not counted; and an accounting of whether any mail-in absentee return envelopes received, collected, or "swept" by the USPS after 6:00 p.m. were included in the election results.

74. On January 10, 2019, the City Clerk filed a response to the court's January 8, 2019 order.

75. City Clerk Takahashi submits that the Office of the City Clerk complied with applicable statutes and administrative rules governing the collection of mail-in absentee return envelopes related to Council District IV and other contests that occurred on November 6, 2018.

76. There were three scheduled pickup times on election day at which City Clerk personnel retrieved mail-in

27

absentee return envelopes from the USPS airport facility:(1) a 9:00 a.m. pickup; (2) a 6:30 p.m. pickup; and (3) a 7:30 p.m. pickup.

77. The 9:00 a.m. pickup time was a pre-established time for City Clerk personnel to pick up mail-in absentee return envelopes from the USPS airport facility. City Clerk personnel picked up mail-in absentee return envelopes from the facility at this time on a daily basis (excluding Sundays) from October 17, 2018 through November 6, 2018.

78. The 6:30 p.m. pickup and 7:30 p.m. pickup were additional pickup times scheduled only for election day.

79. On November 6, 2018, City Clerk personnel picked up mail-in absentee return envelopes at the USPS airport facility at approximately 9:00 a.m. and 6:30 p.m.

80. City Clerk personnel received a call from USPS personnel at approximately 7:00 p.m. on November 6, 2018, during which USPS personnel informed City Clerk personnel that additional mail-in absentee return envelopes were ready for pickup.

81. At approximately 7:30 p.m., City Clerk personnel picked up additional mail-in absentee return envelopes from the USPS airport facility.

82. The following chart summarizes the number of mail-in absentee return envelopes picked up by City Clerk personnel on election day at 6:30 p.m. and 7:30 p.m.:

|  | Island-wide | District IV only |
|---|---|---|
| USPS Airport 6:30 p.m. pickup | 1,093 | 165 |
| USPS Airport 7:30 p.m. pickup | 1,247 | 185 |
| Total | 2,340 | 350 |

83. At approximately 12:00 a.m. on November 7, 2018, the City Clerk contacted the Office of Elections to arrange for the pickup of the mail-in absentee return envelopes that were picked up from the USPS at 6:30 p.m. and 7:30 p.m., as well as the absentee envelopes that were dropped off at polling places.

84. In his declaration, City Clerk Takahashi explains that he relies on the processes and procedures used by the USPS in implementing the agreement between the City Clerk and the USPS covering the USPS's receipt, collection, and/or "sweeping" of its facilities and system as of 6:00 p.m. on November 6, 2018. He states that the practical administrative reality of the receipt, collection, and pickup of mail-in absentee return envelopes in the election process requires the City Clerk to work cooperatively and in conjunction with the USPS, as occurred in this election cycle and past election cycles.

85. Mail-in absentee return envelopes that were not included in the 9:00 a.m., 6:30 p.m., or 7:30 p.m. pickups on November 6, 2018, have been retrieved by City Clerk personnel and set aside by the City Clerk, but they have not been provided to the Office of Elections. As of the filing of City Clerk Takahashi's declaration, there were 734 mail-in absentee return envelopes that the City Clerk retrieved after November 6, 2018.

86. City Clerk Takahashi contacted the USPS Honolulu District to request that one of its officers submit a declaration to provide information relative to the USPS's handling of mail-in absentee return envelopes for the November 6, 2018 election. He was informed that the USPS would not be able to submit a declaration in response to the court's January 8, 2019 order given the court's timeframe and deadline. The USPS did not give City Clerk Takahashi any indication that such a declaration could be made. There is thus no evidence in the record of what actually occurred at the USPS airport facility on November 6, 2018.

87. On January 9, 2019, the State Defendants filed their response to the court's January 8, 2019 order. The State Defendants explained that they are not involved in the handling and collection of the mail-in absentee ballots from the USPS on the day of the general election and have no information to provide this court and the parties in response to the January 8,

2019 order. They state that they rely on City Clerk Takahashi's response.

88. On January 9, 2019, Ozawa filed his response to the court's January 8, 2019 order.

89. Ozawa argues that he was duly elected as councilmember for District IV pursuant to the procedures set forth by statute and administrative rules. Ozawa contends that, under HAR § 3-174-2(a), the City Clerk was authorized to designate the USPS as the City Clerk's representative, thus allowing the USPS to legally receive absentee ballots on the City Clerk's behalf. Any ballots the USPS received prior to the close of polls were thus validly counted, Ozawa contends.

90. Ozawa maintains that there is no evidence that the USPS received any ballots after 6:00 p.m. and that City Clerk Takahashi has averred that the USPS collects only absentee ballots that are at the mail processing plant at 6:00 p.m.

91. Ozawa thus argues that there is no evidence that any absentee return envelopes that were not validly received within the time limit provided in HRS § 15-9(a) were included in the election results.

92. On January 10, 2019, the 39 voters filed a reply to the respective responses filed by Chief Election Officer Nago and the Office of Elections, Ozawa, and City Clerk Takahashi with respect to the court's January 8, 2019 order.

93. The 39 voters contend that City Clerk Takahashi did not provide a detailed explanation as to what occurred at the USPS facility with respect to the 6:00 p.m. "sweep." They argue that City Clerk Takahashi admits that 350 mail-in absentee return envelopes were picked up from the USPS after 6:00 p.m. on election day, which does not satisfy a plain reading of HRS § 15-9(a). Thus, the 39 voters maintain that only those ballots that were retrieved by City Clerk Takahashi, the Office of Elections, or the polling places by 6:00 p.m. may be properly counted.

94. On January 11, 2019, Waters filed a reply to the responses that were filed with respect to the court's January 8, 2019 order.

95. Waters contends that the City Clerk's responses demonstrate mistakes on the part of election officials. Waters specifically argues that the responses fail to detail the procedures actually followed on November 6, 2018, to ensure that the USPS's handling and collection of mail-in absentee return envelopes were in accordance with HRS § 15-9(a) and the agreement between the City Clerk and the USPS.

96. Waters further argues that HRS § 15-9(a)(1) does not permit the City Clerk to designate a representative to receive mail-in absentee return envelopes, as is permitted under HRS § 15-9(a)(2) and (3).

97. Waters thus argues that City Clerk Takahashi acknowledges that 350 ballots were received by the City Clerk after 6:00 p.m. The counting of these ballots was in violation of HRS § 15-9(a)(1), Waters concludes.

### The January 11, 2019 Order

98. On January 11, 2019, the court issued an order (a) consolidating SCEC-18-0000909 and SCEC-18-0000910 for oral argument, (b) scheduling oral argument for January 15, 2019, at 2:00 p.m., and (c) providing the parties an opportunity to file any further declarations and/or memoranda no later than 4:30 p.m. on January 14, 2019.

99. City Clerk Takahashi filed a declaration on January 14, 2019, stating that he has no reason to believe and has been presented with no evidence that the USPS did not comply with the arrangement agreed to at the September 28, 2018 meeting. Like his previous submission, City Clerk Takahashi does not provide details that the arrangement was actually followed on election day.

100. Ozawa also filed a response on January 14, 2019. Ozawa maintains that for the City Clerk to carry out his duties, it is reasonably necessary that he be able to delegate the duty to receive absentee ballots by the close of polls. Specifically, Ozawa argues that the City Clerk can delegate to the USPS his duty to receive by 6:00 p.m. on election day the

33

mail-in absentee return envelopes.  Ozawa does not provide any evidence that such a delegation of duty occurred for the November 6, 2018 election.

### Oral Argument

101. Oral argument was held on January 15, 2019.  See Oral Argument, Waters v. Nago et al. (SCEC-18-0000909) and Iwasa et al. v. Nago et al. (SCEC-18-0000910), http://oaoa.hawaii.gov/jud/oa/19/SCEC_18_909_910.mp3.

102. Counsel for the City Clerk acknowledged that the City Clerk did not "actually have in [his] hands as of 6:00 p.m." the mail absentee envelopes that were purportedly in the USPS system at 6:00 p.m.  See Oral Argument at 47:33-47:41.

103. When asked about the City Clerk's delegation of authority under HAR § 3-174-2, counsel for the City Clerk stated that "there's no administrative rule or statutory guidance in terms of actual delegation."  See Oral Argument at 41:39-41:55. Counsel then explained that he "think[s] the designated representative is what the City characterizes the USPS as[.]" See Oral Argument at 42:07-42:13.

104. Counsel for the City Clerk indicated that the absentee return envelopes provide the City Clerk's post office box as the return address, which is located at the USPS airport facility.  See Oral Argument at 42:56-43:22.  Counsel then clarified that the absentee return envelopes are gathered by the

34

USPS from throughout the airport facility for pickup by the City Clerk and are physically "probably in USPS bins" prior to being collected.  See Oral Argument at 43:58-44:07.

105. Later, counsel for the City Clerk stated that he is not making any suggestion that the USPS is the City Clerk's agent and explained that, within the statutory scheme, the USPS is a designated representative.  See Oral Argument at 47:57-48:28.

106. When asked whether the USPS knew that they were the designee under HRS § 15-9, counsel for the City Clerk stated that he "believed" that that was the function of the meeting that was held between representatives of the City Clerk and USPS Oʻahu representatives.  See Oral Argument at 53:26-54:30.

107. Counsel for the City Clerk reiterated the arrangement with the USPS and explained that it was agreed that, at 6:00 p.m., the USPS would "sweep" its facility of all the "blue envelopes" (i.e., mail-in absentee return envelopes) to ensure that, as of that time, the City had as many blue envelopes as possible.  See Oral Argument at 55:48-56:00.  When asked about the definition of "sweep," counsel stated that it is a characterization of the efforts of the USPS to make sure that their entire facility gathers up the blue envelopes in their system as of 6:00 p.m.  See Oral Argument at 56:02-56:54.

108. Counsel for the City Clerk was asked about the difference in the number of envelopes between the 6:30 p.m. and the 7:30 p.m. pickup following the "sweep" by the USPS, the latter of which included a greater number of absentee return envelopes despite being intended to retrieve only those absentee return envelopes that were missed during the previous pickup. Counsel stated that "that is what the record reflects," that he "ha[s] no explanation for it," and that "that is just the universe of facts that we have to deal with." See Oral Argument at 57:57-59:22.

109. Counsel for the State Defendants explained that the Office of Elections relies on the City Clerk's handling of the absentee ballots. Counsel noted the September 28, 2018 meeting between representatives of the City Clerk and the USPS representatives and described their relationship as "at least an agency relationship." Counsel explained that she did not know if the relationship was "a designated one" or whether the agency agreement had to be in writing. See Oral Argument at 1:21:53-1:24:07.

110. Counsel for the State Defendants explained that the 350 ballots that were picked up from the USPS at the 6:30 p.m. pickup and the 7:30 p.m. pickup were "commingled together, put through the scanner" with the absentee ballots that were dropped off at the polling places as well as the facsimile

ballots that were created from the defective ballots and, therefore, cannot now be separated. Counsel explained that the Office of Elections would not be able to ascertain what the correct result would be if the 350 ballots were declared invalid. See Oral Argument at 1:31:48-1:32:28.

## CONCLUSIONS OF LAW

1. An election contest is instituted by filing a complaint in the supreme court "set[ting] forth any cause or causes, such as but not limited to, provable fraud, overages, or underages, that could cause a difference in the election results." HRS § 11-172 (2009).

2. A complaint challenging the results of an election pursuant to HRS § 11-172 fails to state a claim unless the plaintiff alleges either 1) errors, mistakes or irregularities that could change the outcome of the election, see Tataii v. Cronin, 119 Hawai'i 337, 339, 198 P.3d 124, 126 (2008) (citing Akaka v. Yoshina, 84 Hawai'i 383, 387, 935 P.2d 98, 102 (1997)); Funakoshi v. King, 65 Haw. 312, 317, 651 P.2d 912, 915 (1982), or 2) that the correct result cannot be ascertained because of a mistake or fraud on the part of the precinct officials. HRS § 11-174.5(b) (2009); Akaka, 84 Hawai'i at 387, 935 P.2d at 102.

3. In order for a complaint to be legally sufficient in the first circumstance, the complaint must include actual

37

information "show[ing] that the specific acts and conduct of which they complain would have had the effect of changing the results of the [] election." Elkins v. Ariyoshi, 56 Haw. 47, 49, 527 P.2d 236, 237 (1974); Akaka, 84 Hawaiʻi at 388, 935 P.2d at 103 (holding that, in order for an election challenge to have merit, "the petitioner must 'show that he [or she] ha[s] actual information of mistakes or errors sufficient to change the result'" (quoting Funakoshi, 65 Haw. at 316–17, 651 P.2d at 915)). "An election contest cannot be based upon mere belief or indefinite information." Tataii, 119 Hawaiʻi at 340, 198 P.3d at 127. Further, if the specific irregularities complained of do not "exceed the reported margin between the candidates, the complaint is legally insufficient because, even if its truth were assumed, the result of the election would not be affected." Akaka, 84 Hawaiʻi at 388, 935 P.2d at 103 (citing Elkins, 56 Haw. at 49, 527 P.2d at 237).

4. Similarly, a complaint alleging that fraud or mistake by election officials has made it impossible to ascertain the correct result must include specific facts that if true would prevent an accurate determination of the election outcome. Id.; Akizaki v. Fong, 51 Haw. 354, 461 P.2d 221 (1969).

5. Under either standard, "[i]t is not sufficient that the petitioner points to a 'poorly run and inadequately supervised election process' that evinces 'room for abuse' or 'possibilities of fraud.'" Akaka, 84 Hawaiʻi at 388, 935 P.2d at 103 (quoting Elkins, 56 Haw. at 48, 527 P.2d at 237).

6. In Count I of his complaint, Waters alleges that the absentee ballots in the District IV election counted between the fourth printout and the fifth printout were miscounted because they were not delivered to the State Capitol for counting before the polls closed on election day. Waters claims that as many as 1,286[7] absentee return envelopes were not received by the City Clerk or the Office of Elections by the close of the polls at 6:00 p.m. on November 6, 2018. Waters contends that the counting of these ballots violates HRS § 15-9(a), and they therefore cannot be considered.

7. The 39 voters allege in Count I of their complaint that the City Clerk "miscounted, misapplied, and mishandled" the ballots included in the fifth printout by "failing to follow requirements set forth within the governing statutes and administrative rules." In subsequent filings, the voters clarified their argument, contending that the City Clerk had

---

[7]    See supra, note 3.

violated HRS § 15-9(a) by collecting mail-in absentee return envelopes after the closing of the polls.

8. Because Waters and the 39 voters allege a particular error that would invalidate a number of votes greater than the 22-vote margin by which the election was decided, they have alleged a specific mistake "sufficient to change the result," as is required to state a claim for relief under our precedents.[8] Akaka, 84 Hawai'i at 388, 935 P.2d at 103 (quoting Funakoshi, 65 Haw. at 316–17, 651 P.2d at 915).

9. The court's consideration of matters outside the pleadings converts a motion to dismiss into one for summary judgment. Buscher v. Boning, 114 Hawai'i 202, 212, 159 P.3d 814, 824 (2007).

---

[8] The court notes that the response that Waters and the 39 voters received from the State Defendants and the City Clerk in answer to their inquiries shortly after the election put them at a disadvantage in meeting their burdens in this election contest. Less than one day after the November 15, 2018 "Final Summary Report" was generated, Waters sent questions to the Office of Elections and the City Clerk about the election. Notwithstanding Waters's status as a candidate with a clear interest in the outcome of the race, the Office of Elections and the City Clerk did not respond to all of the questions, particularly with respect to the pickup or delivery times of the mail-in absentee return envelopes on election day, the margin of error for the voting machines, and the manner in which a voter's intent is ensured in a close election without a manual hand count. Similarly, the 39 voters allege that their inquiries were directed to a deputy attorney general who was unable to provide any of their requested information. Further, some of the information that Waters and the 39 voters sought and were not provided appears to have been readily available, as it appeared in a newspaper article shortly thereafter. We note that timely and complete responses to valid election day inquiries help to ensure a meaningful and transparent election process.

10. Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Silva v. City & Cty. of Honolulu, 115 Hawaiʻi 1, 6, 165 P.3d 247, 252 (2007).

11. The fundamental starting point for statutory interpretation is the language of the statute itself. Where the statutory language is plain and unambiguous, this court's sole duty is to give effect to the statute's plain and obvious meaning, which is obtained primarily from the language contained in the statute itself. Statutory language must be read in the context of the entire statute and construed in a manner consistent with its purpose. See Castro v. Melchor, 142 Hawaiʻi 1, 11, 414 P.3d 53, 63 (2018).

12. HRS § 15-9, which governs the return and receipt of absentee return envelopes, provides as follows:

> (a) The return envelope shall be:
>
> (1) Mailed and must be **received by the clerk** issuing the absentee ballot **not later than the closing of the polls on any election day**;
>
> (2) Delivered other than by mail to the clerk issuing the absentee ballot, or another election official designated by the clerk to act on the clerk's behalf, **not later than the closing of polls on any election day**; or
>
> (3) Delivered other than by mail to any polling place within the county in which the voter is registered and deposited by a precinct official in the ballot box **before the closing of the polls on any election day**.

41

(b)    Upon receipt of the return envelope from any person voting under this chapter, the clerk may prepare the ballots for counting pursuant to this section and section 15-10.

(c)    Prior to opening the return and ballot envelopes and counting the ballots, the return envelopes shall be checked for the following:

(1)    Signature on the affirmation statement;

(2)    Whether the signature corresponds with the absentee request or register as prescribed in the rules adopted by the chief election officer; and

(3)    Whether the person is a registered voter and has complied with the requirements of sections 11-15 and 11-16.

(d)    If any of the above requirements is not met or if the return or ballot envelope appears to be tampered with, the clerk or the absentee ballot team official shall mark across the face of the envelope "invalid" and it shall be kept in the custody of the clerk and disposed of as prescribed for ballots in section 11-154.

(e)    If an absentee polling place is established at the clerk's office prior to election day, the officials of the absentee polling place shall check the return or ballot envelopes for the above requirements prior to depositing them in the correct absentee ballot box.

(Emphases added); see also HRS § 15-5(b) (2009 & Supp. 2017) (addressing the delivery of absentee ballots by electronic transmission to voters and providing that "[t]he voter may return the voted ballots and executed forms by electronic transmission or mail; provided that they are received by the issuing clerk no later than the close of polls on election day").

13. HRS § 15-9 requires all absentee return envelopes to be returned no later than the closing of polls on any

election day.  By the closing of polls, all absentee return envelopes must be either (1) mailed and received by the clerk issuing the absentee ballot; (2) delivered other than by mail to the clerk issuing the absentee ballot or another election official designated by the clerk to act on the clerk's behalf; or (3) delivered other than by mail to any polling place within the county in which the voter is registered.

14. Absentee ballots that are received before the closing of the polls on any election day in compliance with HRS § 15-9(a) and that satisfy the affirmation and verification requirements will be counted in determining the result of the election.  HRS § 15-10 (2009); see also, e.g., HAR §§ 3-174-11 (procedure for validating signatures on voter affirmation statements); 3-174-12 (procedure for processing damaged, duplicate, or unidentifiable absentee return envelopes); 3-174-13 (procedure for receiving absentee return envelopes at the precincts); 3-174-14 (procedures for processing absentee mail-in return envelopes after the polls close); 3-174-15 (procedure for transfer of absentee return envelopes to counting center); 3-174-16 (procedure upon receiving absentee ballots at the counting center); 3-174-17 (procedure for processing absentee ballots at the counting center for electronic voting system ballots).

15. For absentee return envelopes that are returned by mail on election day, HRS § 15-9(a)(1) requires that the return envelope be "received by the clerk issuing the absentee ballot not later than the closing of the polls on any election day."

16. HRS § 11-131 (2009) provides that the closing time for the polls on election day is 6:00 p.m., subject to an exception for in-person voters who are in line at the close of voting.[9]

17. HAR § 3-174-2(a), which was promulgated to implement HRS § 15-9 and other election related statutes, provides that "[w]henever a duty is to be performed by the clerk, the clerk may delegate it to a designated representative or the election officials of the absentee polling place."

---

[9] During oral argument, counsel for the City Clerk and the State Defendants argued that, because HRS § 11-131 permits any voter who is waiting in line when the polls close to vote "irrespective of the closing hour of voting," the actual closing of at least some polling places occurs after 6:00 p.m. Counsel for the City Clerk appeared to suggest that, under HRS § 15-9(a)(1), the City Clerk may validly receive mail-in absentee ballots after 6:00 p.m. so long as in-person voting had not concluded at all polling places. As an initial matter, the record contains no evidence by which this court could determine the actual closing of polls according to this argued interpretation. And were we to adopt such a reading of the statute, it would follow that any voters whose absentee mail-in ballots were "received" after 6:00 p.m. but before the conclusion of in-person voting would have been improperly disenfranchised if their votes were not included in the pick-ups following the 6:00 p.m. sweep. In any event, we hold that HRS § 11-131 unambiguously establishes 6:00 p.m. as "the prescribed hour for closing the polls" and it is this time that constitutes "the closing of the polls" for purposes of the HRS § 15-9(a)(1) deadline.

18. Thus, HRS § 15-9(a) requires that all absentee mail-in return envelopes must be received by the City Clerk or an authorized representative by 6:00 p.m. on election day.[10]

19. There were 2,340 mail-in absentee return envelopes that were collected by USPS personnel at the Honolulu Airport mail processing plant on November 6, 2018, that were picked-up by the City Clerk's representative at 6:30 p.m. and 7:30 p.m. 350 of these were from voters registered in Council District IV. The City Clerk argues that these envelopes were the result of a "sweep" of the Honolulu Airport mail processing plant performed by USPS personnel at 6:00 p.m. in accordance with an "agreement" entered into at a September 28, 2018 meeting between representatives of the City Clerk and USPS Oʻahu.

20. The record indicates that an agreement was made during the September 28, 2018 meeting between representatives of the City Clerk and USPS Oʻahu. According to the agreement, USPS personnel would conduct a "sweep" of its Honolulu Airport mail

---

[10]    Waters and the 39 voters point out that, unlike HRS § 15-9(a)(2), HRS § 15-9(a)(1) does not include language indicating mail-in absentee ballots may be received by "another election official designated by the clerk to act on the clerk's behalf."  Therefore, the election challengers argue, HAR § 3-174-2(a) does not permit the City Clerk to delegate this duty to receive mail-in absentee return envelopes to anyone unaffiliated with the Office of the City Clerk.  Because we hold infra that no evidence was offered demonstrating that the City Clerk's designated representative was present at the Honolulu Airport mail processing plant at 6:00 p.m. on November 6, 2018, we need not now decide the extent to which the City Clerk's HRS § 15-9(a)(1) duties are delegable to individuals other than City Clerk personnel.

processing plant at 6:00 p.m. on election day.[11]  Despite requests by Waters and this court, no evidence was provided as to what actually occurred on November 6, 2018 at the USPS Airport mail processing plant at 6:00 p.m. (or any time thereafter) with respect to the mail-in absentee return envelopes.

21. There is no dispute that at 6:00 p.m. the City Clerk's office did not have physical possession or control of the 350 mail-in absentee return envelopes for District IV that were purportedly "swept" by the USPS at its Airport facility and picked-up by the City Clerk's office at 6:30 p.m. and 7:30 p.m. on November 6, 2018.  While counsel for the City Clerk at oral argument indicated that the City Clerk has a post office box at the airport facility where mail-in absentee return envelopes are sent, it was acknowledged that the envelopes were distributed throughout the facility, were not placed in an actual physical enclosure designated for the City Clerk's exclusive use, and remained within the control of USPS personnel.  We thus hold that the facts of this case are legally insufficient to

---

[11]    Neither the City Clerk nor the State Defendants provided an explanation in their filings as to what "sweep" means, the parameters of the "sweep," or the length of time required to conduct a "sweep."  As discussed supra, counsel for the City Clerk stated only during oral argument that a "sweep" is a characterization of the USPS's efforts to gather up all absentee return envelopes in their facility as of 6:00 p.m.

establish the receipt of the challenged envelopes by the City Clerk at 6:00 p.m. Cf. Stewarts' Pharmacies, Ltd. v. Fase, 43 Haw. 131, 145–46 (1959) ("When we apply the intended and correct meaning of the word 'receipt' as used in the act, it is conclusive to our minds that the tax of the retailer, referred to, is paid when the articles are in his possession and when the merchant has unlimited control and dominion over the [items]." (quoting Bacon & Sons v. Martin, 305 U.S. 380, 381 (1939)).

22. A pivotal question, therefore, is whether the City Clerk delegated his duty to "receive" the mail-in absentee return envelopes to a designated representative and, more specifically, whether such a duty was delegated to the USPS or another party present at the facility.[12]

23. Initially, it is noted that in the introduction to the "State and Local Election Mail-User's Guide" published by the USPS and included with Ozawa's Response to this court's January 11, 2019 order, the USPS states that the guide contains "information election officials must consider before they" utilize the mail.[13] Significantly, the Mail-User's Guide

---

[12] This court makes no determination as to whether the USPS may be a designated representative for purposes of HRS § 15-9(a)(1) and HAR § 3-174-2(a).

[13] United States Postal Service, State and Local Election Mail-User's Guide 15 (March 2018), http://about.usps.com/publications/pub632.pdf

specifies that, if election officials wish to arrange to pick up mail-in absentee ballots at a postal service facility, they should "[l]et [their] Postal Service Election Mail coordinator know [their] cut-off time for receiving returned ballots" and "[a]rrange the latest time when an election official may pick up last-minute returns." (Emphasis added.) The USPS thus appears to regard itself as neither an election official nor a representative thereof in the state and local elections in which the USPS provides assistance.

24. The September 28, 2018 meeting between representatives of the City Clerk[14] and USPS O'ahu at which the USPS agreed to conduct a "sweep" of its Honolulu Airport mail processing plant at 6:00 p.m. on election day did not establish a delegation of the City Clerk's duty to receive mail-in absentee return envelopes.[15] No party has provided a declaration

_____

[14] It is noted that the City Clerk's declarations regarding the meeting do not indicate that any representative of the Chief Election Officer was in attendance, and the Chief Election Officer stated in response to this court's January 8, 2019 order that he had no information to provide regarding the handling and collection of mail-in absentee ballots. While the City Clerk is responsible for many aspects of a county-wide election, the ultimate responsibility to supervise a county election held in conjunction with a state election remains in the Chief Election Officer. See HRS § 11-2(a) (2009) (tasking the Chief Election Officer with supervision of all state elections); HRS § 11-91.5(e) (2009 & Supp. 2015) ("The chief election officer shall adopt rules pursuant to chapter 91 to provide for uniformity in the conduct of federal, state, and county elections by mail.").

[15] As stated, HRS § 15-9(a)(1) requires that absentee ballots delivered by mail must be received by the City Clerk by the close of polls on election day in order to be valid. If the USPS as a whole had been designated as the City Clerk's representative as argued by counsel for the

(continued . . .)

48

or document indicating that an individual, group, or entity had been designated as the City Clerk's representative at the Honolulu Airport mail processing facility on election day. Prior to oral argument, neither the City Clerk nor the Chief Election Officer argued in any filing to this court that a designation had been made, nor did they identify any procedure by which such a designation would have occurred.[16]

25. The record is thus devoid of any evidence that the City Clerk effectively delegated his authority to receive mail-in absentee return envelopes at 6:00 p.m. on election day to the USPS or any other designated representative.

26. What the record demonstrates instead is that, after the 9:00 a.m. mail pickup at the USPS Honolulu Airport location on November 6, 2018, City Clerk personnel conducted two

---

(. . . continued)

City Clerk, then arguably all ballots "received" by the USPS mail carriers or placed within USPS mail receptacles before 6:00 p.m. on election day should have been counted, effectively creating a "mail box rule" for mail-in absentee ballots. At oral argument, counsel for the City Clerk contended that only those mail-in absentee return envelopes located within the USPS airport facility should be considered as timely received. But it is self-evident that the inanimate building cannot be designated as the City Clerk's representative. The law does not permit the City Clerk to enfranchise certain voters not meeting statutory requirements while disenfranchising others.

[16] During oral argument, counsel for the City Clerk stated that "there's no administrative rule or statutory guidance in terms of actual delegation." Counsel then asserted, for the first time, that he "think[s] the designated representative is what the City characterizes the USPS as[.]" Counsel was unable to affirm whether the USPS knew of its purported status as the City Clerk's designated representative under HRS § 15-9(a)(1).

additional pickups--a 6:30 p.m. pickup and a 7:30 p.m. pickup. These additional pickups resulted in a total of 2,340 additional mail-in absentee return envelopes, including 350 from voters registered in Council District IV--(a) 1,093 envelopes from the 6:30 p.m. pickup, of which 165 were from voters registered in Council District IV; and (b) 1,247 envelopes from the 7:30 p.m. pickup, of which 185 were from voters registered in Council District IV.[17] The 350 mail-in absentee return envelopes from voters registered in Council District IV were not received by the City Clerk or a designated representative prior to the close of polls.

27. While the City Clerk may have been trying to maximize the receipt of absentee votes by counting all mail-in absentee ballots that were in the USPS facility prior to the closing of polls, any implemented process was required to comply with HRS § 15-9(a)(1). Based on the record in this matter, it cannot be said that there was compliance with the requirement in

---

[17] In the declarations of the Elections Administrator for the City and County of Honolulu that were included with the City Clerk's December 6, 2018 answers to the complaints, it was stated that the 7:30 p.m. pickup was scheduled "if there were any mail absentee return envelopes collected during the 6:00 p.m. sweep of the mail processing plant that were not picked up at the 6:30 p.m. pickup time." During oral argument, counsel for the City Clerk acknowledged that questions regarding the handling of mail-in absentee return envelopes were raised by the fact that more envelopes were picked up in the 7:30 pickup than in the 6:30 p.m. pickup. Counsel stated that there was no readily available explanation for the unexpectedly high number of envelopes that had ostensibly been missed in the 6:30 p.m. pickup.

HRS § 15-9(a)(1) that absentee return envelopes be received by the clerk not later than 6:00 p.m.—the closing of the polls.

28. Additionally, under HRS § 15-9(d), the Office of the City Clerk has a specific duty to mark and segregate any ballots that do not meet the requirements of HRS § 15-9, which includes those absentee ballots that were not received prior to the closing of the polls. Because the City Clerk was unable to make any direct representation regarding the procedures actually employed at the USPS Airport mail processing plant, the City Clerk is unable to provide adequate assurances that the requirements of HRS § 15-9(d) were fulfilled.

29. "The right of the people to shape the way in which they are governed through free and fair elections is the basis of our democratic society." See City & Cty. of Honolulu v. State, 143 Hawai'i 455, 455, 431 P.3d 1228, 1230 (2018). "Implicit in that right is . . . the right to have as nearly perfect an election proceeding as can be provided," which requires that objective standards be applied as to which votes are properly counted toward the result. Akizaki, 51 Haw. at 356, 461 P.2d at 223; see also id. at 358, 461 P.2d at 224 (holding that the Hawai'i Constitution provides for the "neutral and disinterested" resolution of election contests). Based on the record in this matter and the applicable law, the inclusion

of the 350 mail-in absentee return envelopes that were considered for validation[18] and the subsequent counting of the ballots from the validated envelopes in the vote tally for the election for District IV was improper.[19]

30. The counting of these 350 invalidly received absentee ballots potentially altered the election results for Council District IV and, inasmuch as they have been inseparably commingled with the other ballots, a recount that would exclude the invalid votes is not possible.[20]  Consequently, a correct

---

[18]     During oral argument, counsel for the City Clerk was able to offer few specifics regarding the signature validation process conducted pursuant to HRS § 15-9(c)(2) and HAR § 3-174-11.  Counsel was not aware of any process by which voters are ever informed when their votes are invalidated because the signatures on their respective affirmation statements have been deemed not to correspond with those on their absentee ballot requests or voter registrations.  Further, counsel indicated that voter signatures from other sources are consulted for comparison, including drivers' records from the "DMV"--a procedure that would appear to be unauthorized under the plain terms of HRS § 15-9(c)(2) and HAR § 3-174-11.  We note that 64 votes from voters registered in Council District IV were invalidated on signature grounds in this race.

[19]     During oral argument, counsel for the State Defendants argued that the close-of-polls deadline for receiving mail-in absentee ballot set by HRS § 15-9(a)(1) is directory rather than mandatory, relying on Lane v. Fern, 20 Haw. 290, 299–300 (Haw. Terr. 1910).  To the extent Lane, which interpreted a long-since repealed statute concerning the hours during which in-person polling places must remain open, stands for the proposition that this court should assume statutory time-limits on the casting of votes to be non-binding, we hold that it is fundamentally incompatible with our more recent precedent and must be regarded as overruled.  See Akizaki, 51 Haw. at 360, 461 P.2d at 225 (holding that mail-in absentee votes that were not postmarked by then-existing statutory deadline were not validly cast).

[20]     While an accurate recount could not have been conducted in this case in light of election officials' inability to separate the comingled ballots, it is noted that there does not appear to be established procedures for conducting a recount in Hawaiʻi's statutes or administrative rules.  Cf. Florida Admin. Code § 1S-2.031 (setting forth detailed recounting procedures).

result without the inclusion of the 350 ballots cannot be ascertained.

31. Because the correct results of the November 6, 2018 special election for the city councilmember seat for District IV cannot be determined, the special election must be invalidated.[21]  See Akizaki, 51 Haw. at 360, 461 P.2d at 225 ("Our judgment is . . . that the election was invalid for the reason that a correct result cannot be ascertained because of the mistake . . . on the part of the election officials in opening the late-post-marked envelopes and commingling those ballots with ballots validly cast.  Therefore . . . in order to protect the right of the people . . . to choose their representatives, we invalidate the election . . . ."); HRS § 11-174.5(b) (2009) (stating that this court is authorized to

---

[21]     In a previous case addressing a county clerk's failure to allow the plaintiffs to view a minor change in the format of a ballot question made to assure the layout complied with a relevant county charter provision, this court stated that, "as a general rule, an election will not be invalidated for failure of the election officials to comply strictly with an election statute where there has been substantial compliance and there is no showing of fraud."  Thirty Voters of Kauai Cty. v. Doi, 61 Haw. 179, 184, 599 P.2d 286, 290 (1979).  In that case, we held the format change only modified the manner in which the voter would express approval or disapproval of the ballot question and could not "be deemed to have been substantive."  Id.  By pointed contrast, this case involves the very question of whether the absentee votes were validly cast.  We hold that the counting of 350 mail-in absentee ballots that were not received by the City Clerk prior to the close of polls substantially complied with neither HRS § 15-9(a)(1) nor HRS § 15-9(d), which specifically provides that such ballots shall be marked "invalid" and disposed of in the manner prescribed by statute.  Cf. Akizaki, 51 Haw. at 360, 461 P.2d at 225.

"invalidate the special . . . election on the grounds that a correct result cannot be ascertained").

32. In light of the court's decision, the court need not reach a decision on the merits of the election challengers' remaining claims of mistake or fraud.

### JUDGMENT

Based upon the foregoing findings of fact and conclusions of law, the election complaints are granted in part in favor of Waters and the 39 voters and the motions to dismiss or, in the alternative, motions for summary judgment filed by Chief Election Officer Nago and the Office of Elections are denied. Judgment is entered in favor of Waters and the 39 voters as to Count I of their respective complaints and against Chief Election Officer Nago, the Office of Elections, and City Clerk Takahashi. The second special election for councilmember for District IV, City and County of Honolulu is invalidated. Waters's and the 39 voters' complaints are denied in all other respects.

A certified copy of this judgment shall be filed with the Governor of the State of Hawai'i in accordance with HRS § 11-174.5(b).[22]

| | |
|---|---|
| Thomas Waters<br>plaintiff, pro se<br>in SCEC-18-0000909 | /s/ Mark E. Recktenwald<br><br>/s/ Paula A. Nakayama |
| Thomas M. Otake<br>for plaintiffs<br>in SCEC-18-0000910 | /s/ Sabrina S. McKenna<br><br>/s/ Richard W. Pollack |
| Ernest H. Nomura<br>Duane W. H. Pang<br>for defendant<br>Glen Takahashi, City Clerk of<br>the City & County of Honolulu | /s/ Michael D. Wilson |



Valri Lei Kunimoto
Patricia Ohara
for defendants
Scott T. Nago, Chief Election
Officer and State of Hawai'i
Office of Elections

Abigail M. Holden
Joachim P. Cox
Robert K. Fricke
for intervenor
Trevor Ozawa

---

[22] HRS § 11-174.5(b) provides in relevant part as follows: "If the judgment should be that the . . . special . . . election was invalid, a certified copy thereof shall be filed with the governor, and the governor shall duly call a new election to be held not later than one hundred twenty days after the judgment is filed.").