**Electronically Filed
Supreme Court
SCEC-24-0000794
24-DEC-2024
12:02 PM
Dkt. 50 FFCL**

SCEC-24-0000794

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

_____

KELLY T. KING, ROBERT KING, DANIEL KALEOALOHA KANAHELE,
RACHEL CHRISTOPHER, WENDY CHING, PATRICIA NUCKOLLS,
LISA SEIKAI DARCY, ROBIN KNOX, BRANDI CORPUZ,
ANN L. PITCAITHLEY, BRIDGET A. MOWAT, KRISSTA CALDWELL,
CLARE H. APANA, CALEB S. HARPER, LEONARD NAKOA III,
SUSAN CAMPBELL, PHYLLIS ROBINSON, BONNIE NEWMAN, AMY J. CHANG,
KYLANNAH SPRADLIN, JOCELYN CRUZ, DANIEL GRANTHAM, ALIKA ATAY,
WILLIAM R. GREENLEAF, ASHFORD DELIMA, PAUL DESLAURIERS,
CONNIE JO HAMILTON, GARY GREGG SAVAGE, COLLEEN DELIMA,
KAREN DORRANCE, and MICHAEL ZARATE,
Plaintiffs,

vs.

MOANA M. LUTEY, County Clerk, County of Maui, and TOM COOK,
Defendants.

_____

ORIGINAL PROCEEDING

FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT
(By: Recktenwald, C.J., McKenna, Eddins, Ginoza, and Devens, JJ.)

Upon consideration of the "Complaint for Election Contest"
filed by the Plaintiffs on November 25, 2024 (complaint) and the
parties' submissions, we rule in favor of Defendants and against
Plaintiffs as to all claims stated in the complaint.

In accordance with Hawaiʻi Revised Statutes (HRS) § 11-174.5 (Supp. 2021), we enter the following findings of fact, conclusions of law and judgment.

**FINDINGS OF FACT**

1.  As of 2020 the elections in the State of Hawaiʻi have been conducted primarily by mail, but in-person voting is still available at voter service centers.  See HRS §§ 11-101 (Supp. 2021), 11-109 (Supp. 2021).

2.  On November 5, 2024, the County of Maui held a nonpartisan general election for the seat of the South Maui councilmember.  The two candidates were Defendant Tom Cook and Plaintiff Kelly T. King.

3.  For the subject election, the State of Hawaiʻi Office of Elections was responsible for the printing and counting of ballots.  HRS § 11-110(b)(1)(B) (Supp. 2021).  Defendant Moana M. Lutey, in her official capacity as the County Clerk of Maui County (Clerk) was responsible for the mailing and receipt of ballots, among other duties.  HRS § 11-110(b)(1)(A); see HRS §§ 11-106 (Supp. 2021), 11-108 (Supp. 2021).

4.  HRS § 11-102 (Supp. 2022) sets forth the procedures for conducting elections by mail.  Under this process, on or about Friday, October 18, 2024, the Clerk began mailing out the ballot packages to registered voters.  See HRS § 11-102(b).  The ballot package to a voter included: an official ballot; a return

2

identification envelope with postage prepaid; a secrecy envelope or secrecy sleeve; and instructions. HRS § 11-102(a).

5. The return identification envelope used in the subject election visibly stated the following instructions on the envelope: "SIGNATURE REQUIRED: If you do not sign, your ballot will not be counted!" Under this header appeared the following affirmation:

> I affirm: I am a resident and registered voter of the representative district and precinct as indicated on this envelope and have voted without the personal assistance of my employer, agent of my employer, agent of my labor union, or any candidate listed on the ballot.

From the "signature required" header appeared an arrow pointing to a blank rectangular box signaling where a voter was instructed to sign the voter's name.

6. The front of the return identification envelope stated "Official Election Mail," included the return address for the Elections Division, Office of the County Clerk, and a notice that no postage was necessary if mailed in the United States.

7. The secrecy sleeve had the following information stated, in pertinent part, on its front and back:

> SECRECY SLEEVE INSTRUCTIONS
> 1. After you have finished voting, re-fold your ballot and place into this optional secrecy sleeve.
> 2. Place the secrecy sleeve into the postage paid return envelope.
> 3. Sign the affirmation statement on the return envelope. If you do not sign, your ballot will not be counted.
> 4. Mail or deliver your signed and sealed return envelope. Your ballot must be received by 7:00 pm on Election Day to be counted. Visit

3

> elections.hawaii.gov for information on returning and tracking the status of your ballot.
>
> Made an error or changed your mind?  Contact your County Elections Division for a replacement ballot.  Do not use whiteout.
>
> Forgot to use this sleeve?  Your vote will remain confidential whether or not you used this optional ballot secrecy sleeve.
>
> View the Digital Voter Guide at elections.hawaii.gov.
>
> Election fraud and voter fraud may subject the voter, upon conviction, to imprisonment, a fine, or both.  For complete information, consult Chapter 19, Hawaii Revised Statutes.

8.  The secrecy sleeve referred the voter to an internet website where the voter could obtain a copy of the "Digital Voter Guide" published by the State of Hawai'i Office of Elections.  This Digital Voter Guide informed the voter, in pertinent part, as to the processing of ballots and tracking of ballots as follows:

> PROCESSING YOUR BALLOT
> . . . .
> The signature on the return envelope is compared to the signature on your voter record.  If officials are unable to confirm a match, you'll be notified to fix the issue within five business days post-election.
>
> If your signature is successfully matched, your ballot is securely transported to the counting center.  At the counting center, your voted ballot is processed through vote counting scanners.
>
> TRACK YOUR BALLOT
> Sign up for ballot tracking alerts via text, email or voice call at elections.hawaii.gov.  The service lets you know where your ballot is and sends key reminders including an alert when the ballot return deadline is approaching.

9.  For the general election, pursuant to HRS § 11-106, Hawai'i Administrative Rule (HAR) § 3-177-651 (eff. 2020), and HAR § 3-177-652 (eff. 2020), the Clerk was responsible for

4

reviewing return identification envelopes and providing notice to voters whose envelopes were deemed deficient.

10. HRS § 11-106 provides:

§ 11-106. Deficient return identification envelopes

If:
    (1) A return identification envelope is returned with an unsigned affirmation;

    (2) The affirmation signature does not match a reference signature image; or

    (3) A return identification envelope contains another condition that would not allow the counting of the ballot,

the clerk shall make an attempt to notify the voter by first class mail, telephone, or electronic mail to inform the voter of the procedure to correct the deficiency. The voter shall have five business days after the date of the election to cure the deficiency. The chief election officer may adopt rules regarding requirements and procedures for correcting deficient return identification envelopes. The counting of ballots and disclosure of subsequent election results may continue during the time period permitted to cure a deficiency under this section. The clerk's inability to contact voters under this section shall not be grounds for a contest for cause under section 11-172. This section shall apply to all return identification envelopes, including ballots utilizing the provisions of section 11-107 or chapter 15 or 15D.

11. HAR § 3-177-651 provides in pertinent part:

§ 3-177-651. Return identification envelopes; general preparing of ballots for counting.

(a) Upon receipt of the return identification envelope, the clerk may prepare the ballots for counting. Before opening return identification envelopes and counting the ballots, the return identification envelopes shall be checked for the following:

    (1) Signature on the affirmation statement;

    (2) Whether the signature corresponds with a reference signature image using the provisions of HAR § 3-177-652; and

    (3) Whether there is a condition that would not allow the counting of the contents of the return identification envelope (e.g. the voter has already

5

voted, or otherwise returned a return identification envelope that has been validated).

(b) If any requirement listed in subsection (a) is not met or if the return identification envelope appears to be tampered with, the clerk shall mark across the face of the envelope "invalid" and it shall be kept in the custody of the clerk and disposed of as prescribed for ballots in HRS § 11-154, unless it is subsequently determined to be valid. To the extent a return identification envelope is deemed invalid, the provisions of HAR § 3-177-654 relating to the correction of deficient return identification envelopes may apply.

. . . .

(e) All return identification envelopes complying with subsection (a) shall be deemed valid and secured by election officials for subsequent processing and counting.

12. HAR § 3-177-652 provides:

§ 3-177-652. Return identification envelopes; signature validation.

(a) The clerk will initially compare the signature on a return identification envelope with the reference signature or reference signatures of the voter. The clerk may authorize the use of a signature device, as defined in HAR § 3-177-653, to compare signatures. A signature considered matched by a signature device will be considered valid and not require further verification.

(b) A "reference signature" is any signature provided in connection with the administration of elections or any signature provided to election officials from a governmental entity obtained in the ordinary course of business (e.g. voter signatures on any election issued form or application, correspondence with election officials, signature capture cards sent to and returned by voters, signatures from the Department of Transportation or county licensing examiners, or signatures from any governmental entity shared with election officials).

(c) Any signature not initially validated by the signature device or that was not submitted to a signature device will be visually compared by the election official.

(1) As a return identification envelope was issued and transmitted to the voter, the return of the return identification envelope or electronic equivalent will be rebuttably presumed to be from the voter and any signature contained therein as that of the voter;

(2) A voter is permitted to use a variation of their

6

name, to the extent it can be recognized as such by the reviewing election official;

(3) The election official will review the general appearance of the signatures taking into account the above noted rebuttable presumption, permitted name variations, and the following:

> (A) type of writing (e.g. cursive versus print);
>
> (B) speed of writing (e.g. harmonious versus slow and deliberate);
>
> (C) overall spacing;
>
> (D) overall size and proportions;
>
> (E) position of the signature (e.g. slanted versus straight); and
>
> (F) spelling and punctuation.

(4) The election official will consider whether any apparent differences can be reasonably explained, by the facts and circumstances surrounding the signatures. The election official may consider, but not be limited to, the following considerations:

> (A) When the signatures were made in comparison to each (e.g. a significant period of time has transpired between signatures);
>
> (B) The age of the writer at the time of the signatures;
>
> (C) How the signatures were made (e.g. driver license offices may use an electronic signature pad to record signatures, including those used for voter registration, while an envelope may be signed in ink); or
>
> (D) Whether household members signed and returned each other's return identification envelope by accident, in which case, if the signatures match each of the correct voter's signature reference image and the voters have not otherwise voted, such that the counting of the impacted ballots would not result in a voter having voted a ballot not associated with their residence or containing questions or contests they are not eligible to vote on, the impacted return identification envelopes may be considered valid.

(d) A voter may make a mark in place of a signature on the affirmation statement on the return identification envelope

7

so long as there is a witness' signature and address on the affirmation statement. In such a situation, the return identification envelope will be considered valid. If no witness' signature and address appear on the affirmation statement, then the return identification envelope will be deemed invalid. However, if a voter is physically unable to sign or to make a mark, they may use the provisions of HRS § 456-19 to have a notary sign on their behalf, and the return identification envelope will be considered valid.

13. Under HAR § 3-177-653 (eff. 2020) a "signature device" is a device that "either captures images or uses imported images which it analyzes and compares to existing signature reference images."

14. For the subject general election, in accordance with HAR § 3-177-652(a), the Clerk utilized a signature device described by the Clerk as the Agilis election mail sorting and processing system (signature device). This signature device was utilized by the Clerk to compare the signature on the return identification envelopes received from voters with the reference signatures in that particular voter's registration file. The signature scanning device would either accept the signature as valid or would reject the signature as invalid.

15. Return identification envelopes accepted by the signature scanning device were placed in sealed and locked containers and transported to the counting center operated by the State of Hawaiʻi Office of Elections.

16. The signature device utilized by the Clerk would flag potentially deficient return identification envelopes where, in

8

pertinent part, a signature was missing or the signature did not match the reference signature.

17. For those return identification envelopes rejected by the signature device, the Clerk's staff visually compared the signature on the rejected return identification envelope with the voter's reference signatures on file. The Clerk's staff performing this task were trained and instructed to examine the signatures with the presumption that the voter did, in fact, sign the return identification envelope. The signature specimens on file for a voter typically contained multiple reference signatures from a variety of government sources including applications to register to vote submitted by the voter to the Office of Elections, or applications submitted by a voter to the Department of Motor Vehicles for a driver's license or State identification card (collectively, "voter's registration file"). See also HRS § 11-15.7 (Supp. 2021) (establishing automatic registration to vote as part of any application for the issuance of a State identification card or driver's license, with the applicant presented the option to decline); HAR § 3-177-153(a) (authorizing the sharing of digitized signatures captured by a government agency with election officials to validate and confirm a voter's identity in any election-related matter in which a signature is necessary); HAR § 3-177-652(b) (defining "reference signature").

9

18. If the Clerk's staff determined that the signature matched any reference signature in the voter's registration file, the return identification envelope would be validated and placed in sealed and locked containers and transported to the counting center operated by the State of Hawaiʻi Office of Elections.

19. If the Clerk's staff determined that the signature on the return identification envelope did not match any of the reference signatures on file for the voter, the return identification envelope would be reviewed by the supervising election administrator for a final determination.

20. The supervising election administrator employed the same criteria as staff by presuming, as part of this review, that the signature was from the voter. The administrator would not identify a signature as deficient unless it exhibited identifiable differences from the reference signatures and these differences could not be reasonably explained, such as changes in age.

21. If the election administrator determined that the signature matched any reference signature in the voter's registration file, the return identification envelope would be validated and the ballot would then be placed in sealed and locked containers and transported to the counting center operated by the State of Hawaiʻi Office of Elections.

22. Return identification envelopes deemed invalid by the Clerk were securely stored and locked in the vault in the Office of the County Clerk.

23. For these return identification envelopes deemed invalid, the Clerk employed several means by which it would notify these voters that their return envelopes were deemed deficient.

24. First, each voter was mailed a letter via the United States Postal Service by first class mail. This letter was mailed within one business day of receipt of a deficient return identification envelope throughout the entire election cycle and was mailed to the same address as the original ballot package.

25. Second, if a voter had an email address on file, they would have received an email notifying the voter when the ballot was received by the Clerk's Office, or of any deficiency requiring action by the voter. Every voter in Maui County with an email address on file with the Clerk's Office received an email within a day of their return envelope being deemed deficient by the Clerk's Office.

26. Third, if a voter had a phone number on file the Clerk's Office would call or attempt to call the voter to inform them of their need to cure, how to cure and their deadline to cure.

11

27. In accordance with the process set forth in HRS § 11-106 and HAR § 3-177-651, the Clerk would determine that a return identification envelope was deficient where, in pertinent part, there was no signature, or the signature was rejected by the signature device as failing to match the reference signatures on file for the voter and the Clerk's election administrator, upon review, agreed with this invalidity determination.

28. For the subject election, there were a total of 1,556 return identification envelopes that, following validation by the signature device and visual comparison by election officials described above, were determined to be missing the voter's signature, contained a signature that did not match the voter's reference signature images, or contained another condition that required a determination that the return identification envelope was deficient. As to the type of other "conditions" that may result in invalidation of the return identification envelope, HAR § 3-177-651(a)(3) sets forth the following examples: "the voter has already voted, or otherwise returned a return identification envelope that has been validated."

29. All voters with a return identification envelope rejected as deficient were mailed a letter with notice on how to cure the deficiency within one business day of the Clerk's receipt of the deficient envelope. The Clerk introduced an authenticated copy of the letter that was mailed to affected

12

voters.  This letter appeared on the Clerk's letterhead and provided the voter with notice of the reason for the deficiency as well as the following instructions on how to correct the deficiency:

> You may fix this deficiency by printing, completing, and signing the form on the reverse side of this letter. Computer-generated signatures are not acceptable.  Note that the Affidavit must be received no later than 4:30 p.m. on November 13, 2024.  Additionally, if the deficiency is due to a mismatched signature . . . or another condition, please provide proof of identity, such as a photo of a government-issued photo ID.

Then, the letter provided the address and contact information for the Clerk's office, including an email address where the completed form and proof of identification could be submitted, as well as a phone number that any voter with questions could call.

30.  In addition to the deficiency notice and cure process detailed above, all voters in the County of Maui had the option of independently tracking the status of their ballots online using the services of a company called BallotTrax.  Voters did not need to create an account to view their ballot status and the service was free to use.  BallotTrax provided the option of allowing voters to receive updates on their ballot's status by text message, email, or phone.  Every voter was provided the option of signing up online for this free service.  To promote the BallotTax system, the Clerk's Office issued press releases, radio advertisements, and social media posts.

13

31. With respect to those voters that submitted a return identification envelope on the date of the general election (November 5, 2024) which the Clerk identified as deficient, the Clerk's Office mailed a letter to these voters with instructions on how to cure the deficiency by United States Postal Service on November 6, 2024. In addition by November 6, 2024 these same voters — if enrolled in BallotTax — would have received an email notification of their ballot deficiencies with instructions to call the Clerk's office. And by close of business on November 7, 2024 the Clerk's Office had placed calls to every voter with a phone number on file to provide notice that the return identification envelope had been marked deficient.

32. For the general election, the deadline for a voter to cure the deficient return identification envelope was 4:30 p.m. on Wednesday, November 13, 2024.

33. Four of the Plaintiffs received a cure letter from the Clerk's Office and had the opportunity to timely cure the deficiency with their return identification envelopes.

34. All return identification envelopes that were deemed valid were secured in sealed containers and transferred to the State of Hawaiʻi Office of Elections to be opened and counted. For the subject general election no return identification envelopes were opened by the Clerk's Office. Rather, the opening and counting of ballots was the exclusive responsibility

14

of the State of Hawaiʻi Office of Elections.  See HRS § 11-110(b)(1)(B).

35.  In response to the notice provided by the Clerk's Office to the 1,556 voters with return identification envelopes deemed deficient, the Clerk's Office received timely and complete responses from 594 voters to cure the deficiency thereby allowing the ballots for these voters to be counted and included in the final tally.  Twenty-three voters decided to vote in-person rather than cure their deficient mail-in ballots.  A total of 939 voters ultimately failed to cure their deficient return identification envelopes by the statutory deadline of November 13, 2024.  See HRS § 11-106.

36.  The Clerk's Office in performing their duties established by law to contact the 1,556 voters with deficient return identification envelopes, was informed by sixteen voters that the return identification envelopes received by the Clerk had not been mailed by them.  The Clerk's Office transmitted this information to the Maui Police Department for investigation into potential election fraud.

37.  At the end of the cure period on November 13, 2024 the final result for the office of councilmember for South Maui was reported by the State of Hawaiʻi Office of Elections as follows: Defendant Cook had received 26,423

15

votes; and, Plaintiff King had received 26,326 votes. Blank votes totaled 10,750. Thus, the vote differential is 97 votes in favor of Defendant Cook (election result).

38. On November 25, 2024, Plaintiffs filed the election contest with this court and thereby challenged the election result. The claims stated in the complaint are addressed below. The Plaintiffs include the candidate, Plaintiff King, as well as thirty voters who claim to reside within the subject election district.

39. The parties subsequently filed motions seeking summary judgment in their favor. In accordance with HRS § 11-174.5, the parties also submitted evidence for the court to review, including declarations and records.

**CONCLUSIONS OF LAW**

1. To prevail on an election complaint seeking to invalidate a general election the plaintiff must establish "that a correct result cannot be ascertained because of a mistake or fraud on the part of the voter service center officials[.]" HRS § 11-174.5; see also Waters v. Nago, 148 Hawaiʻi 46, 65, 468 P.3d 60, 79 (2019) (invalidating the special election where the correct result could not be determined because invalidly received ballots were commingled with the other ballots).

2. All claims of Plaintiffs' Complaint are grounded in the theory that the Clerk erred in the review of the signatures

16

on the return identification envelopes. Plaintiffs argued, in pertinent part, that the Clerk erred by failing to apply the presumption set forth in HAR § 3-177-652(c)(1) that the return identification envelope was from the voter and any signature was that of the voter. Plaintiffs also contended the Clerk erred in applying the standards required by law with respect to the review of voter's signatures on the return identification envelopes.

3. In opposition, the Clerk argued that the Clerk's office committed no mistake or error in the processing and review of return identification envelopes submitted by voters. The Clerk argued, among other things, that the process employed by the Clerk's office complied with the applicable election laws set forth at HAR § 3-177-652. The Clerk contended that the process her office employed provided the presumption of validity required by HAR § 3-177-652(c)(1) to all of the submitted return identification envelopes, and only rejected a signature when there were sufficient discrepancies to warrant a finding that they could not be verified, thereby overcoming any presumption of validity.

4. For the reasons set forth below, we agree with the Clerk. The burden was on Plaintiffs to establish a mistake by the Clerk such that the correct result of the election cannot be

17

ascertained.  HRS § 11-174.5.  Based on the evidence submitted, we hold that Plaintiffs failed to sustain this burden.

5.    HAR § 3-177-652 is a rule adopted by the Chief Election Officer under HRS § 11-4 (Supp. 2019), which authorized the Chief Election Officer to promulgate rules governing elections.  Id.  HAR § 3-177-652 sets forth the process the Clerk was required to follow in validating signatures on return identification envelopes submitted by voters.

6.    The evidence established that the Clerk followed the process set forth in HAR § 3-177-652(a) by submitting the return identification envelopes in the first instance to a signature device which would identify any return identification envelopes that should be subjected to further review.  The reasons the signature device would reject a return identification envelope included the failure of the voter to actually affix the voter's signature to the return identification envelope, or where the signature device determined that the signature on the return identification envelope did not match the voter's reference signature in that particular voter's registration file.  Next, the Clerk's Office performed a manual review of the signature where it provided a presumption to the signature that it was from the voter.

7.    Plaintiffs take issue with this second step — the manual review performed by the Clerk's Office.  In support,

18

Plaintiffs submitted evidence from four voters who testified they signed their "ordinary signature" yet their return identification envelopes were rejected by the Clerk based on a determination that the signatures on the return identification envelope did not match the reference signatures on file for each voter.

8.    The record lacks sufficient evidence for this Court to conclude whether, in fact, the Clerk erred in the review of these four voters' signatures.  For example, the reference signature for each of these voters was not submitted by the Plaintiffs; nor was a copy of the signature that was made on the subject return identification envelope.  This Court is thus not persuaded that the Clerk made a mistake in the review of these four signatures at issue.

9.    Even if the record could establish an actual mistake by the Clerk in the review of these four signatures, Plaintiffs carried the burden of establishing that these mistakes caused a difference in the election such that the correct result is not ascertainable.  See HRS §§ 11-172, 11-174.5.  Plaintiffs failed to sustain this burden because the record established that each of these same four voters was provided with notice and the opportunity to cure the deficiency determination made by the Clerk.

19

10. Under HRS § 11-108(c) the Clerk was statutorily required to "make reasonable efforts to determine the validity of ballots within five business days following an election day." For any return identification envelope the Clerk determined was deficient based on a signature that did not match the reference signature image, the Clerk was required by HRS § 11-106 to "make an attempt to notify the voter by first class mail, telephone, or electronic mail to inform the voter of the procedure to correct the deficiency. The voter shall have five business days after the date of the election to cure the deficiency." HRS § 11-106.

11. The evidence established that every voter with a return identification envelope that the Clerk determined was deficient under HAR §§ 3-177-651 and 3-177-652, was mailed a letter that provided the voter with notice and the opportunity to cure the deficiency. The preponderance of the evidence established that all of these notices were mailed by the Clerk to the same address where the original ballot was mailed within one business day of the Clerk's receipt of the deficient return identification envelope. For any return identification envelopes that were received on the election date (November 5, 2024) the notice of deficiency was mailed to the voter the next day on November 6, 2024. See HRS § 11-106. This mailing occurred well before the November 13, 2024 deadline for the

20

voter to cure the deficiency identified on the return identification envelope. See id. (establishing the statutory deadline of five business days following an election day to cure a deficiency with a return identification envelope).

12. In addition to providing the mailed notice required by HRS § 11-106, the Clerk established a process to provide email and telephone notice of the deficiency to any voter with an email address or telephone number on file. The emailed notice of deficiency was transmitted to voters on a rolling basis within one business day of the Clerk's receipt of the deficient return identification envelope. For those voters that submitted deficient return identification envelopes on November 5, 2024 (election date), the emailed notice of deficiency was provided no later than November 6, 2024. All telephone calls providing notice of the deficiency were made by the Clerk to voters with a valid phone number on file by no later than November 7, 2024. The Clerk's email and phone notices of deficiency were provided to those voters well before the November 13, 2024 deadline for those voters to cure. See HRS § 11-106.

13. We conclude that the Clerk's actions in providing notice to these voters complied with the election laws including the requirement set forth in HRS § 11-108(c) that "[t]he clerk shall make reasonable efforts to determine the validity of ballots within five business days following an election day."

21

The reasonableness of the Clerk's actions in providing notice is demonstrated by the following undisputed facts: the Clerk's Office received timely and complete responses from 594 voters to cure the deficiency thereby allowing the ballots for these voters to be counted and included in the final tally; twenty-three voters decided to vote in-person rather than cure their deficient mail-in ballots; and, sixteen voters informed the Clerk's Office that the return identification envelopes received by the Clerk — and which the Clerk had determined were deficient — had not been mailed by them and this information was thereafter transmitted by the Clerk's Office to the Maui Police Department for further investigation into potential election fraud. Moreover, at least four Plaintiffs acknowledged receiving notice from the Clerk of the deficiency determination associated with their return identification envelopes, and were able to timely cure the deficiencies before the November 13, 2024 deadline. Upon curing the deficiencies, the return identification envelopes for these Plaintiffs were securely transferred to the counting center operated by the State of Hawai'i Office of Elections.

14. We conclude that all the 939 voters whose return identification envelopes were deemed deficient by the Clerk and subsequently failed to cure the deficiency by the statutory deadline, were provided with reasonable notice and the

22

opportunity to correct the deficiency on the return identification envelope. The preponderance of the evidence established that all of these 939 voters were equally provided with the opportunity to participate in the election and none of them was disenfranchised as a result of the Clerk's deficiency determination.

15. Plaintiffs failed to establish any error was committed by the Clerk in the review and processing of the return identification envelopes. Plaintiffs also failed to establish a legal cause between the mistakes alleged in the complaint and the final election results because the preponderance of the evidence established that every voter with a rejected return identification envelope was provided with notice and a sufficient period of time to cure the deficiency determination made by the Clerk.

16. We hold that Plaintiffs as to all claims failed to establish that the correct result of the election cannot be ascertained because of a mistake on the part of the Clerk. See HRS § 11-174.5. Accordingly, the court rules in favor of Defendants and against Plaintiffs as to all claims made in the Complaint.

17. The final result as reported by the Chief Election Officer is Tom Cook with 26,423 votes and Kelly T. King with 26,326, which is a vote differential of 97 in favor of Tom Cook.

23

18.   The court issues this decision based on the evidence submitted by the parties and the record before the court.  See HRS § 11-174.5(b) (providing "the court shall cause the evidence to be reduced to writing and shall give judgment, stating all findings of fact and of law").  Accordingly, the motions pending before the court are denied as moot.

## JUDGMENT

It is hereby ordered in accordance with HRS § 11-174.5 that Defendant Tom Cook received a majority of the votes cast and has been elected to the office of councilmember for the South Maui seat on the Maui County Council.

The court enters judgment in favor of Defendants and against Plaintiffs as to all claims stated in the complaint.

The Clerk shall sign and deliver to Defendant Tom Cook the certificate of election which shall be conclusive of the right of Defendant Tom Cook to the office of councilmember for the South Maui seat on the Maui County Council.

DATED:  Honolulu, Hawaiʻi, December 24, 2024.

/s/ Mark E. Recktenwald

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

/s/ Lisa M. Ginoza

/s/ Vladimir P. Devens