**Electronically Filed
Supreme Court
SCEC-24-0000800
10-JAN-2025
02:13 PM
Dkt. 47 FFCL**

SCEC-24-0000800

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

_____

COREY ROSENLEE,
Plaintiff,

vs.

GLEN TAKAHASHI, in his official capacity as the City Clerk of
the City and County of Honolulu; REX QUIDILLA, in his official
capacity as the Elections Administrator of the City and County
of Honolulu; SCOTT NAGO, Chief Election Officer, State of Hawaiʻi
Office of Election; and ELIJAH PIERICK,
Defendants.

_____

ORIGINAL PROCEEDING

<u>FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT</u>
(By: Recktenwald, C.J., McKenna, Eddins, Ginoza, and Devens, JJ.)

Upon consideration of the "Complaint for Election Contest"
filed by the Plaintiff Corey Rosenlee on November 25, 2024
(complaint) and the parties' submissions, we rule in favor of
Defendants and against Plaintiff as to all claims stated in the
complaint.

In accordance with Hawaiʻi Revised Statutes (HRS) § 11-174.5 (Supp. 2021), we enter the following findings of fact, conclusions of law and judgment.

**FINDINGS OF FACT**

1.  As of 2020 the elections in the State of Hawaiʻi have been conducted primarily by mail, but in-person voting is still available at voter service centers.  See HRS §§ 11-101 (Supp. 2021), 11-109 (Supp. 2021).

2.  On November 5, 2024, the State of Hawaiʻi held a general election for State Representative, District 39.  The two candidates were the Republican candidate, Defendant Elijah Pierick, and the Democratic candidate, Plaintiff Corey Rosenlee.

3.  For the subject election, the State of Hawaiʻi Office of Elections was responsible for the printing and counting of ballots.  HRS § 11-110(b)(1)(B) (Supp. 2021).  The City Clerk of the City and County of Honolulu was responsible for the mailing and receipt of ballots and voter service centers, among other duties.  HRS § 11-110(b)(1)(A); see HRS §§ 11-106 (Supp. 2021), 11-108 (Supp. 2021).

4.  HRS § 11-102 (Supp. 2022) sets forth the procedures for conducting elections by mail.  Under this process, on or about Friday, October 18, 2024, the Clerk began mailing out the ballot packages to registered voters.  See HRS § 11-102(b).  The ballot package to a voter included: an official ballot; a return

2

identification envelope with postage prepaid; a secrecy envelope or secrecy sleeve; and instructions.  HRS § 11-102(a).

5.    For the general election, pursuant to HRS § 11-106, Hawaiʻi Administrative Rule (HAR) § 3-177-651 (eff. 2020), and HAR § 3-177-652 (eff. 2020), the Clerk was responsible for reviewing return identification envelopes and providing notice to voters whose envelopes were deemed deficient.

6.    HRS § 11-106 provides:

> § 11-106.  Deficient return identification envelopes
>
> If:
> > (1) A return identification envelope is returned with an unsigned affirmation;
> >
> > (2) The affirmation signature does not match a reference signature image; or
> >
> > (3) A return identification envelope contains another condition that would not allow the counting of the ballot,
>
> the clerk shall make an attempt to notify the voter by first class mail, telephone, or electronic mail to inform the voter of the procedure to correct the deficiency.  The voter shall have five business days after the date of the election to cure the deficiency.  The chief election officer may adopt rules regarding requirements and procedures for correcting deficient return identification envelopes.  The counting of ballots and disclosure of subsequent election results may continue during the time period permitted to cure a deficiency under this section.  The clerk's inability to contact voters under this section shall not be grounds for a contest for cause under section 11-172.  This section shall apply to all return identification envelopes, including ballots utilizing the provisions of section 11-107 or chapter 15 or 15D.

7.    HAR § 3-177-651 provides in pertinent part:

> § 3-177-651.  Return identification envelopes; general preparing of ballots for counting.
>
> (a) Upon receipt of the return identification envelope, the clerk may prepare the ballots for counting.  Before opening return identification envelopes and counting the ballots,

3

the return identification envelopes shall be checked for the following:

> (1) Signature on the affirmation statement;
>
> (2) Whether the signature corresponds with a reference signature image using the provisions of HAR § 3-177-652; and
>
> (3) Whether there is a condition that would not allow the counting of the contents of the return identification envelope (e.g. the voter has already voted, or otherwise returned a return identification envelope that has been validated).

(b) If any requirement listed in subsection (a) is not met or if the return identification envelope appears to be tampered with, the clerk shall mark across the face of the envelope "invalid" and it shall be kept in the custody of the clerk and disposed of as prescribed for ballots in HRS § 11-154, unless it is subsequently determined to be valid. To the extent a return identification envelope is deemed invalid, the provisions of HAR § 3-177-654 relating to the correction of deficient return identification envelopes may apply.

. . . .

(e) All return identification envelopes complying with subsection (a) shall be deemed valid and secured by election officials for subsequent processing and counting.

8. HAR § 3-177-652 provides:

§ 3-177-652. Return identification envelopes; signature validation.

(a) The clerk will initially compare the signature on a return identification envelope with the reference signature or reference signatures of the voter. The clerk may authorize the use of a signature device, as defined in HAR § 3-177-653, to compare signatures. A signature considered matched by a signature device will be considered valid and not require further verification.

(b) A "reference signature" is any signature provided in connection with the administration of elections or any signature provided to election officials from a governmental entity obtained in the ordinary course of business (e.g. voter signatures on any election issued form or application, correspondence with election officials, signature capture cards sent to and returned by voters, signatures from the Department of Transportation or county licensing examiners, or signatures from any governmental entity shared with election officials).

4

(c) Any signature not initially validated by the signature device or that was not submitted to a signature device will be visually compared by the election official.

(1) As a return identification envelope was issued and transmitted to the voter, the return of the return identification envelope or electronic equivalent will be rebuttably presumed to be from the voter and any signature contained therein as that of the voter;

(2) A voter is permitted to use a variation of their name, to the extent it can be recognized as such by the reviewing election official;

(3) The election official will review the general appearance of the signatures taking into account the above noted rebuttable presumption, permitted name variations, and the following:

(A) type of writing (e.g. cursive versus print);

(B) speed of writing (e.g. harmonious versus slow and deliberate);

(C) overall spacing;

(D) overall size and proportions;

(E) position of the signature (e.g. slanted versus straight); and

(F) spelling and punctuation.

(4) The election official will consider whether any apparent differences can be reasonably explained, by the facts and circumstances surrounding the signatures. The election official may consider, but not be limited to, the following considerations:

(A) When the signatures were made in comparison to each (e.g. a significant period of time has transpired between signatures);

(B) The age of the writer at the time of the signatures;

(C) How the signatures were made (e.g. driver license offices may use an electronic signature pad to record signatures, including those used for voter registration, while an envelope may be signed in ink); or

(D) Whether household members signed and returned each other's return identification

5

envelope by accident, in which case, if the signatures match each of the correct voter's signature reference image and the voters have not otherwise voted, such that the counting of the impacted ballots would not result in a voter having voted a ballot not associated with their residence or containing questions or contests they are not eligible to vote on, the impacted return identification envelopes may be considered valid.

(d) A voter may make a mark in place of a signature on the affirmation statement on the return identification envelope so long as there is a witness' signature and address on the affirmation statement. In such a situation, the return identification envelope will be considered valid. If no witness' signature and address appear on the affirmation statement, then the return identification envelope will be deemed invalid. However, if a voter is physically unable to sign or to make a mark, they may use the provisions of HRS § 456-19 to have a notary sign on their behalf, and the return identification envelope will be considered valid.

9. Under HAR § 3-177-653 (eff. 2020) a "signature device" is a device that "either captures images or uses imported images which it analyzes and compares to existing signature reference images."

10. For the subject general election, in accordance with HAR § 3-177-652(a), the Clerk utilized a signature device. This signature device was utilized by the Clerk to compare the signature on the return identification envelopes received from voters with the reference signatures in that particular voter's registration file. The signature scanning device would either accept the signature as valid or would reject the signature as invalid.

6

11.  Return identification envelopes accepted by the signature scanning device were transferred to State of Hawaiʻi Office of Elections for counting.

12.  The signature device utilized by the Clerk would flag potentially deficient return identification envelopes where, in pertinent part, a signature was missing or the signature did not match the reference signature.

13.  For those return identification envelopes rejected by the signature device, the Clerk's staff visually compared the signature on the rejected return identification envelope with the voter's reference signatures on file.  The Clerk maintained that in performing this task it presumed that the voter did, in fact, sign the return identification envelope.  The signature specimens on file for a voter typically contained multiple reference signatures from a variety of government sources including applications to register to vote submitted by the voter to the Office of Elections, or applications submitted by a voter to the Department of Motor Vehicles for a driver's license or State identification card (collectively, "voter's registration file").  See also HRS § 11-15.7 (Supp. 2021) (establishing automatic registration to vote as part of any application for the issuance of a State identification card or driver's license, with the applicant presented the option to decline); HAR § 3-177-153(a) (eff. 2020) (authorizing the

7

sharing of digitized signatures captured by a government agency with election officials to validate and confirm a voter's identity in any election-related matter in which a signature is necessary); HAR § 3-177-652(b) (defining "reference signature").

14. If the Clerk's staff determined that the signature matched any reference signature in the voter's registration file, the return identification envelope would be validated and transferred to State of Hawai'i Office of Elections for counting.

15. If the Clerk's staff determined that the signature on the return identification envelope did not match any of the reference signatures on file for the voter, the return identification envelope would be reviewed by a designated supervising election administrator or permanent staff for a final determination.

16. If during this second tier review, the election administrator or permanent staff determined that the signature matched any reference signature in the voter's registration file, the return identification envelope would be validated and transferred to State of Hawai'i Office of Elections for counting.

17. For these return identification envelopes deemed invalid, the Clerk mailed each voter a letter via the United States Postal Service by first class mail. This letter was mailed within one business day of receipt of a deficient return identification envelope throughout the entire election cycle.

This letter explained that the voter had until Wednesday, November 13, 2024 to cure the deficiency and provided instructions on how to cure the deficiency. With respect to those voters that submitted a return identification envelope on the date of the general election (November 5, 2024) which the Clerk identified as deficient, the Clerk's Office mailed a letter to these voters with instructions on how to cure the deficiency by United States Postal Service on November 6, 2024.

18. For the subject election, there were a total of 111 return identification envelopes that, following validation by the signature device and visual comparison by election officials described above, were determined to be missing the voter's signature or contained a signature that did not match the voter's reference signature images.

19. For the general election, the deadline for a voter to cure the deficient return identification envelope was on Wednesday, November 13, 2024.

20. All return identification envelopes that were deemed valid were transferred from the Clerk to the State of Hawai'i Office of Elections to be opened and counted. For the subject general election no return identification envelopes were opened by the Clerk's Office. Rather, the opening and counting of ballots was the exclusive responsibility of the State of Hawai'i Office of Elections. See HRS § 11-110(b)(1)(B).

9

21. In response to the notice provided by the Clerk's Office to the 111 voters with return identification envelopes deemed deficient, the Clerk's Office received timely and complete responses from 47 voters to cure the deficiency thereby allowing the ballots for these voters to be counted and included in the final tally. A total of 64 voters ultimately failed to cure their deficient return identification envelopes by the statutory deadline of November 13, 2024. See HRS § 11-106. Of these 64 return identification envelopes that were never cured, 20 of the envelopes had no signature, and 44 had a signature that was not accepted as valid by the Clerk.

22. At the end of the cure period on November 13, 2024 the final result for State Representative, District 39 was reported by the State of Hawai'i Office of Elections as follows: Defendant Pierick had received 4,712 votes; and, Plaintiff Rosenlee had received 4,701 votes. Blank votes totaled 587. Thus, the vote differential is 11 votes in favor of Defendant Pierick (election result).

23. On November 25, 2024, Plaintiff Rosenlee filed the election contest with this court and thereby challenged the election result. The claims stated in the complaint are addressed below.

24. Defendants subsequently filed motions seeking dismissal or summary judgment in their favor. In accordance

10

with HRS § 11-174.5, the parties also submitted evidence for the court to review.

## CONCLUSIONS OF LAW

1.  To prevail on an election complaint seeking to invalidate a general election the plaintiff must establish "that a correct result cannot be ascertained because of a mistake or fraud on the part of the voter service center officials[.]"  HRS § 11-174.5(b); see also Waters v. Nago, 148 Hawai'i 46, 65, 468 P.3d 60, 79 (2019) (invalidating the special election where the correct result could not be determined because invalidly received ballots were commingled with the other ballots).

2.  Plaintiff's complaint alleged six claims.

First, that the Clerk committed a mistake in the review of signatures on return identification envelopes.

Second, that the Clerk committed a mistake by only mailing notice of the Clerk's deficiency determination.

Third, that the Clerk committed a mistake in securing and monitoring in-person voting lines.

Fourth, that the Clerk committed a mistake because the long lines to vote on election day deprived voters of their right to vote.

The fifth and sixth claims were grounded in the theory that the Clerk's decision to reject a voter's signature as deficient was an equal protection and due process violation.

11

3. In opposition, the Clerk argued that the Clerk's office committed no mistake in the processing and review of return identification envelopes submitted by voters, nor in the supervision of voter service centers. In defense, the Clerk maintained, among other things, that Plaintiff submitted no evidence to carry his burden of proof.

4. For the reasons set forth below, we agree with the Clerk. The burden was on Plaintiff to establish a mistake by the Clerk such that the correct result of the election cannot be ascertained. HRS § 11-174.5(b). Based on the evidence submitted, we hold that Plaintiff failed to sustain this burden.

5. HAR § 3-177-652 is a rule adopted by the Chief Election Officer under HRS § 11-4 (Supp. 2019), which authorized the Chief Election Officer to promulgate rules governing elections. Id. HAR § 3-177-652 sets forth the process the Clerk was required to follow in validating signatures on return identification envelopes submitted by voters.

6. The evidence established that the Clerk followed the process set forth in HAR § 3-177-652(a) by submitting the return identification envelopes in the first instance to a signature device which would identify any return identification envelopes that should be subjected to further review. The reasons the signature device would reject a return identification envelope included the failure of the voter to actually affix the voter's

12

signature to the return identification envelope, or where the signature device determined that the signature on the return identification envelope did not match the voter's reference signature in that particular voter's registration file.  Next, the Clerk's Office performed a manual review of the signature.  The Clerk's Office presumed the signature was from the voter.

7.    Plaintiff takes issue with this second step — the manual review performed by the Clerk's Office.  Yet Plaintiff submitted no relevant evidence to support his claim that the Clerk committed a mistake in the review of return identification envelopes.

8.    Even if the record could establish an actual mistake by the Clerk in the review of the signatures on the return identification envelopes, Plaintiff carried the burden of establishing that these mistakes caused a difference in the election such that the correct result is not ascertainable.  See HRS §§ 11-172 (Supp. 2021), 11-174.5.  Plaintiff failed to sustain this burden because the record established that every voter with a deficient return identification envelope was provided with notice and the opportunity to cure the deficiency determination made by the Clerk.

9.    Under HRS § 11-108(c) the Clerk was statutorily required to "make reasonable efforts to determine the validity of ballots within five business days following an election day."

13

For any return identification envelope the Clerk determined was deficient based on a signature that did not match the reference signature image, the Clerk was required by HRS § 11-106 to "make an attempt to notify the voter by first class mail, telephone, or electronic mail to inform the voter of the procedure to correct the deficiency. The voter shall have five business days after the date of the election to cure the deficiency." HRS § 11-106.

10. The evidence established that every voter with a return identification envelope that the Clerk determined was deficient under HAR §§ 3-177-651 and 3-177-652, was mailed a letter that provided the voter with notice and the opportunity to cure the deficiency. The preponderance of the evidence established that all of these notices were mailed to the voter within one business day of the Clerk's receipt of the deficient return identification envelope. For any deficient return identification envelopes that were received on the election date (November 5, 2024) the notice of deficiency was mailed to the voter the next day on November 6, 2024. See HRS § 11-106. This mailing occurred well before the November 13, 2024 deadline for the voter to cure the deficiency identified on the return identification envelope. See id. (establishing the statutory deadline of five business days following an election day to cure a deficiency with a return identification envelope).

14

11. We conclude that the Clerk's actions in providing notice to these voters complied with the election laws including the requirement set forth in HRS § 11-108(c) that "[t]he clerk shall make reasonable efforts to determine the validity of ballots within five business days following an election day." The reasonableness of the Clerk's actions in providing notice is demonstrated by the undisputed fact that 47 of the initially rejected 111 return identification envelopes were cured by voters who received the mailed notice of deficiency from the Clerk. Upon curing the deficiencies, the return identification envelopes for these voters were securely transferred to the counting center operated by the State of Hawai'i Office of Elections.

12. We conclude that all the 64 voters whose return identification envelopes were deemed deficient by the Clerk and subsequently failed to cure the deficiency by the statutory deadline, were provided with reasonable notice and the opportunity to correct the deficiency on the return identification envelope. The preponderance of the evidence established that all of these 64 voters were equally provided with the opportunity to participate in the election and none of them was disenfranchised as a result of the Clerk's deficiency determination.

13. Plaintiff failed to establish any error was committed by the Clerk in the review and processing of the return identification envelopes. Plaintiff also failed to establish a legal cause between the mistakes alleged in the complaint and the final election results because the preponderance of the evidence established that every voter with a rejected return identification envelope was provided with notice and a sufficient period of time to cure the deficiency determination made by the Clerk.

14. Plaintiff's claim that voters improperly entered the voting line after the deadline on the election day was not supported by any admissible evidence.

15. As to Plaintiff's claim of long lines impacting voting, the Clerk argued in opposition that the Clerk was under no legal obligation to maintain a maximum wait time for in-person voting on election day. For the reasons set forth below, we agree with the Clerk. Under HRS § 11-102(d), the Clerk was required to establish voter service centers and places of deposit. The record established that the Clerk complied with this statutory duty by maintaining two voter service centers on election day.

While the Clerk did not submit any evidence as to the dates the voter service centers were open and available to the public, we take judicial notice of the fact that the 2024 Hawaiʻi Voter

16

Guide published by the Office of Elections informed the public that voter service centers were opened beginning on October 22, 2024 through election day for voter registration and accessible in-person voting.[1]

As such, we are not persuaded by the evidence presented by Plaintiff that the Clerk committed any mistake in establishing and supervising the voter service centers.

We also reject Plaintiff's suggestion that the long wait times at the voter service centers on election day means that voters were disenfranchised. First, no direct evidence was submitted by Plaintiff that any voter in State District 39 was deprived of the right to vote. Second, the record established that voters had over two weeks to cast their votes. This is because the election process established by election officials provided voters with a vote-by-mail option from October 19, 2024 and in-person voting as early as October 22, 2024. Thus, election officials provided voters with over two weeks to cast their ballots leading up to the general election day, November 5, 2024.[2]

---

[1]    See 2024 Hawaiʻi Voter Guide, State of Hawaiʻi, Office of Elections (2024), https://digitalvoterguide.hawaii.gov/wp-content/themes/hawaii-elections/assets/pdf/general_digital_voter_guide_en_US.pdf [https://perma.cc/7NFX-8JVA]

[2]    The Clerk should consider whether the strong demand for in-person voting on the general election day demonstrates a prospective need for more voter service centers in the City and County of Honolulu. See generally HRS § 11-109 (requiring the clerk to establish voter service centers "to service the particular needs of each county's voters").

16. We hold that Plaintiff as to all claims failed to establish that the correct result of the election cannot be ascertained because of a mistake on the part of the Clerk. See HRS § 11-174.5(b). Accordingly, the court rules in favor of Defendants and against Plaintiff as to all claims made in the complaint.

17. The final result as reported by the Chief Election Officer is Elijah Pierick with 4,712 votes and Corey Rosenlee with 4,701, which is a vote differential of 11 in favor of Elijah Pierick.

18. The court issues this decision based on the evidence submitted by the parties and the record before the court. See HRS § 11-174.5(b) (providing "the court shall cause the evidence to be reduced to writing and shall give judgment, stating all findings of fact and of law"). Accordingly, the motions pending before the court are denied as moot.

## JUDGMENT

It is hereby ordered in accordance with HRS § 11-174.5 that Defendant Elijah Pierick received a majority of the votes cast and has been elected to the office of State Representative, District 39.

The court enters judgment in favor of Defendants and against Plaintiff as to all claims stated in the complaint.

The Chief Election Officer shall sign and deliver to Defendant Elijah Pierick the certificate of election which shall be conclusive of the right of Defendant Elijah Pierick to the office of State Representative, District 39.

DATED:  Honolulu, Hawaiʻi, January 10, 2025.

/s/ Mark E. Recktenwald

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

/s/ Lisa M. Ginoza

/s/ Vladimir P. Devens

19